**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NATIONAL ATM COUNCIL, INC.
    9802-12 Baymeadows Road, No. 196
    Jacksonville, FL 32256,

    on behalf of itself and its membership,
    and,

ATMs OF THE SOUTH, INC.
    3613 North Arnoult Rd.
    Metairie, LA 70002,

BUSINESS RESOURCE GROUP, INC.
    14825 Spring Hill Drive
    Frenchtown, MT 59834,

CABE & CATO, INC.
    8601 Dunwoody Place, Ste. 106
    Atlanta, GA 30350,

JUST ATMS, INC.
    125 Ryan Industrial Ct, Ste. 101
    San Ramon, CA 94583,

WASH WATER SOLUTIONS, INC.
    231 Fairfield Drive
    Brewster, NY 10509,

ATM BANKCARD SERVICES, INC.
    · 31 Elmwood Loop
    Madisonville, LA 70447,

MEINERS DEVELOPMENT COMPANY OF
LEE'S SUMMIT, MISSOURI, LLC
    520 West 123rd Street
    Kansas City, MO 64145,

MILLS-TEL, CORP. d/b/a First American ATM
    1800 West Broward Blvd.
    Ft. Lauderdale, FL 33312,

SELMAN TELECOMMUNICATIONS
INVESTMENT GROUP, LLC
    5717 Clarendon Dr.
    Plano, TX 75093,

SCOT GARDNER d/b/a SJI
    2497 Horsham Drive
    Germantown, TN 38139,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

OCT 1 2 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Civil Action No._____

Case: 1:11-cv-01803
Assigned To : Jackson, Amy Berman
Assign. Date : 10/12/2011
Description: Antitrust

(caption continues on next page)

1

TURNKEY ATM SOLUTIONS, LLC )
    8601 Dunwoody Place, Ste. 106 )
    Atlanta, GA 30350, )
    )
TRINITY HOLDINGS LTD, INC. )
    17369 Shirley Avenue )
    Port Charlotte, FL 33948, )
    )
    and )
    )
T & T COMMUNICATIONS, INC. and )
RANDAL N. BRO d/b/a T & B Investments )
    405 Witt Road )
    Center Point, TX 78010, )
    )
    on behalf of themselves and all others )
    similarly situated, )
    )
        *Plaintiffs*, )
    )
    v. )
    )
VISA INC., VISA U.S.A. INC., VISA )
INTERNATIONAL SERVICE ASSOCIATION, )
and PLUS SYSTEM, INC., )
    595 Market Street )
    San Francisco, CA 94105-2802, )
    )
and )
    )
MASTERCARD INCORPORATED and )
MASTERCARD INTERNATIONAL )
INCORPORATED d/b/a MasterCard Worldwide )
    2000 Purchase Street )
    Purchase, NY 10577, )
    )
        *Defendants.* )
    )

## CLASS ACTION COMPLAINT

Plaintiffs, THE NATIONAL ATM COUNCIL, INC. (the "association plaintiff"), on

behalf of itself and its membership, and ATMs OF THE SOUTH, INC., BUSINESS

RESOURCE GROUP, INC., CABE & CATO, INC., JUST ATMS, INC., WASH WATER

SOLUTIONS, INC., ATM BANKCARD SERVICES, INC., MEINERS DEVELOPMENT

COMPANY OF LEE'S SUMMIT, MISSOURI, LLC, MILLS-TEL CORP., SCOT GARDNER

d/b/a SJI, SELMAN TELECOMMUNICATIONS INVESTMENT GROUP, LLC., TURNKEY

ATM SOLUTIONS, LLC., TRINITY HOLDINGS LTD., INC., and T & T

COMMUNICATIONS, INC. and RANDAL N. BRO d/b/a T & B Investments (the

"representative class plaintiffs" or "plaintiffs"), on behalf of themselves and all others similarly

situated and by and through their undersigned attorneys, bring this civil antitrust class action

against defendants, VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE

ASSOCIATION, and PLUS SYSTEM, INC. (collectively, "Visa") and MASTERCARD

INCORPORATED and MASTERCARD INTERNATIONAL INCORPORATED d/b/a

MasterCard Worldwide (collectively, "MasterCard") for treble damages to remedy violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, and for injunctive relief to prevent future harm,

demand trial by jury, and allege:

## I.     NATURE OF THE ACTION

1.     This action challenges the establishment and enforcement by Visa and

MasterCard of a uniform agreement among nearly every payment card-issuing bank in the

United States to fix prices for automated teller machine ("ATM") services, to suppress interbrand

competition between ATM networks, and to constrain operators of ATMs from exercising

autonomous judgment in their business decisions. The agreements, unlawful *per se*, result in

supra-competitive fees to consumers for ATM services, unduly suppress the volume of ATM

services available to the public, and unreasonably restrain commerce in violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1.

2.     This suit seeks damages for the antitrust injury inflicted by defendants' antitrust

violation on the representative class plaintiffs and a putative class of independent ATM

operators. The suit also seeks an injunction enjoining defendants from continuing to observe or

3

enforce the unlawful rules and operating regulations and any similar restraint on competition in the market for ATM services.

## II.   JURISDICTION AND VENUE

3.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the injuries sustained by plaintiffs by reason of defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to obtain injunctive relief from continued violations of Section 1 in the future.

4.     This court has subject-matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. Sections 1331, 1337, 2201, and 2202.

5.     Venue in the District of the District of Columbia is proper under 28 U.S.C. Section 1391 because each defendant transacts business and/or is found within this District. A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws alleged herein was and is carried out within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District.

6.     Jurisdiction over the defendants comports with the United States Constitution and with 15 U.S.C. Sections 15, 22, and 26.

## III.   THE PARTIES

### A.   The Plaintiffs

7.     Plaintiff, THE NATIONAL ATM COUNCIL, INC., (the "NAC") is a Florida corporation with its principal place of business in Jacksonville, FL operating as a trade association under Section 501(c)(6) of the Internal Revenue Code of 1986. The purpose of the NAC is, in part, to promote the common business interests and improve business conditions of

4

independent operators of ATMs. The NAC is the successor by merger of two former trade associations known as the National Association of ATM ISOs and Operators ("NAAIO") and the Alliance of Specialized Communications Providers ("ASCP"). The association plaintiff seeks injunctive relief to prevent continuing and future harm to its members from the violations alleged herein, for the common benefit of its membership as a whole, and in furtherance of its goals and purposes as a trade organization representing the interests of independent ATM operators.

8.     Plaintiff, ATMs OF THE SOUTH, INC., is a Louisiana corporation with its principal place of business in Metairie, LA. The company operates ATMs as a registered "Independent Sales Organization" ("ISO").

9.     Plaintiff, BUSINESS RESOURCE GROUP, INC.., is a Montana corporation with its principal place of business in Frenchtown, MT. The company operates ATMs as a registered ISO.

10.     Plaintiff, CABE & CATO, INC., is a Georgia corporation with its principal place of business in Atlanta, GA. The company operates ATMs as a registered ISO.

11.     Plaintiff, JUST ATMS, INC., is a California corporation with its principal place of business in San Ramon, CA. The company operates ATMs as a registered ISO.

12.     Plaintiff, WASH WATER SOLUTIONS, INC., is a New York corporation with its principal place of business in Brewster, NY. The company operates ATMs as a registered ISO.

13.     Plaintiff, ATM BANKCARD SERVICES, INC., is a Louisiana corporation with its principal place of business in Madisonville, LA. The company operates ATMs as an affiliate of a registered ISO.

14.     Plaintiff, MEINERS DEVELOPMENT COMPANY OF LEE'S SUMMIT, MISSOURI, LLC, is a Missouri limited liability company with its principal place of business in Kansas City, MO. The company operates ATMs as an affiliate of a registered ISO.

15.     Plaintiff, MILLS-TEL, CORP. d/b/a FIRST AMERICAN ATM, is a Florida corporation with its principal place of business in Ft. Lauderdale, FL. The company operates ATMs as an affiliate of a registered ISO.

16.     Plaintiff, SCOT GARDNER d/b/a SJI, is a sole-proprietor residing in Germantown, TN. The business operates ATMs as an affiliate of a registered ISO.

17.     Plaintiff, SELMAN TELECOMMUNICATIONS INVESTMENT GROUP, LLC, is a Texas limited liability company with its principal place of business in Plano, TX. The company operates ATMs as an affiliate of a registered ISO.

18.     Plaintiff, TURNKEY ATM SOLUTIONS, LLC, is a Georgia limited liability company with its principal place of business in Atlanta, GA. The company operates ATMs as an affiliate of a registered ISO.

19.     Plaintiff, TRINITY HOLDINGS LTD., INC., is a Florida corporation with its principal place of business in Port Charlotte, FL. The company operates ATMs as an affiliate of a registered ISO.

20.     Plaintiff, T & T COMMUNICATIONS, INC. and RANDAL N. BRO d/b/a T & B Inevestments, is a general partnership of an individual ("Bro") who resides in Bellville, TX and a Texas corporation ("T & K") with its principal place of business in Center Point, TX. The partnership operates ATMs as an affiliate of a registered ISO.

21.     The putative plaintiff class in this lawsuit includes approximately 350 non-bank, independent sales organizations ("ISOs") that are sponsored by one or more sponsoring financial

institutions and are registered with Visa and MasterCard as "registered ATM ISOs," together with an even greater number of the ISOs' ATM-operating contractual affiliates ("affiliates;" the putative plaintiff class, consisting of ISOs and their affiliates, are referred to herein as the "independent ATM operators"). Independent ATM operators deploy slightly more than half of the ATMs presently in service in the United States, or approximately 200,000 terminals.

**B.     The Defendants**

22.     Defendant, VISA INC., is a Delaware corporation with its principal place of business in San Francisco, California. VISA INC. has offices, transacts business, or is found in the District of Columbia.

23.     Defendant, VISA U.S.A. INC., is a Delaware corporation with its principal place of business in San Francisco, CA owned and controlled by VISA INC.

24.     Defendant, VISA INTERNATIONAL SERVICE ASSOCIATION, is a Delaware corporation with its principal place of business in San Francisco, CA owned and controlled by VISA INC.

25.     Defendant, PLUS SYSTEM, INC., is a Delaware corporation with its principal place of business in San Francisco, CA owned and controlled by VISA INC.

26.      Defendant, MASTERCARD INCORPORATED, is a Delaware corporation with its principal place of business in Purchase, New York. MASTERCARD INCORPORATED has offices, transacts business, or is found in the District of Columbia.

27.     Defendant, MASTERCARD INTERNATIONAL INCORPORATED, is a Delaware non-stock (membership) corporation with its principal place of business in Purchase, New York owned and controlled by MASTERCARD INCORPORATED.

28.     The acts charged in this complaint as having been done by defendants and their co-conspirators were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' business or affairs and the acts charged in this complaint continue to the present day.

## C.     Non-Party Co-Conspirators

29.     Defendants are descendents of bankcard associations formerly jointly owned and operated by a majority of the retail banks in the United States. Visa, Inc became a publicly held corporation after an initial public offering of its stock began trading on the New York Stock Exchange on March 18, 2008. MasterCard Inc became a publicly held corporation after an initial public offering of its stock began trading on the exchange on May 24, 2006. Nonetheless, banks continue to hold non-equity membership interests in defendants' subsidiaries and the largest among them also hold equity interests and seats on the defendants' boards of directors. The defendants continue to refer to their bank customers as "members" of Visa and MasterCard and continue to operate principally for the benefit of their member banks. The unreasonable restraints of trade in this case are horizontal agreements among the issuers of Visa and MasterCard products to adhere to rules and operating regulations that require ATM access fees to be fixed at a certain level. These restraints originated in the rules of the former bankcard associations agreed to by the banks themselves. By perpetuating this arrangement, the banks collectively have ceded power and authority to Visa and MasterCard to design, implement, and enforce a horizontal price-fixing restraint in which they are knowing participants. In short, the violation in this case is a horizontal agreement among every bank that issues Visa- or MasterCard-branded payment cards—including every principal U.S. bank—organized and supervised by the defendants as

ringleaders and enforcers for the purpose of fixing the surcharge that consumers pay for ATM services.

## IV.    TRADE AND INTERSTATE COMMERCE

30.    The defendants' PIN debit payment cards, issued by the nation's banks and other depository institutions, are utilized in an enormous volume of ATM transactions involving a substantial dollar amount of commerce and are marketed, sold and used in the flow of interstate commerce. A "PIN debit" payment card is any card that requires entry of a "personal identification number," a cardholder's unique 4-digit code, to authenticate a debit transaction at the point of the transaction.

31.    Visa provides ATM services for cards branded with the Visa, Visa Electron, Interlink, and PLUS service marks at ATMs and terminals connected to the Visa, PLUS, and Interlink networks. In 2007, U.S. cardholders used Visa's PIN-based platform to access $ 395 billion in cash.

32.    MasterCard provides ATM services for cards branded with the MasterCard, Maestro or Cirrus service marks at ATMs and terminals participating in the MasterCard Worldwide Network. Excluding Cirrus- and Maestro-branded cards, cardholders used MasterCard-branded cards to access $ 202 billion in cash in the U.S. in 2007.

## V.    FACTUAL BACKGROUND

### A.    PIN-Debit Cards and ATM Transactions

33.    ATM transactions are initiated by use of a PIN-debit card. PIN-debit cards include "pay now" cards, which allow a cardholder to effect an automatic debit from a checking, demand deposit, or other financial account. PIN-debit cards also include "pay later" cards, such as credit, deferred debit, or charge cards, which require payment within an agreed upon period of

time. Finally, PIN-debit cards may be "pay before" cards, which are pre-funded up to a certain monetary value. So defined, a PIN-debit card may be capable also of signature-debit or credit transactions. Nonetheless, all ATM transactions are PIN-debit transactions and only cards with PIN-debit capability may be used in an ATM. For purposes of this complaint any payment card that can be used in an ATM is referred to as a "PIN-debit card."

34. A PIN debit cardholder can obtain cash, monitor account balances, or transfer balances at an ATM. Some ATMs also accept deposits or dispense items of value other than cash, such as stamps or travelers checks.

35. ATM services are available to PIN debit cardholders from both bank and non-bank ATMs. Typically, banks charge their customers for ATM services by levying a fee on the account associated with the card. Consumers pay for ATM services from banks of which they are not customers and from non-bank ATM operators by paying a surcharge levied at the point of the transaction (an "access fee"). A cardholder assessed an access fee may also be charged a "foreign ATM fee" by the card issuing bank.

36. An overwhelming majority of cards used for ATM transactions are Visa- or MasterCard-branded bank account-linked PIN-debit cards. As Visa states on page 17 of its Form 10-K filed with the U.S. Securities and Exchange Commission for the fiscal year ended September 30, 2010, "In the debit card market segment, Visa and MasterCard are the primary global brands." Some ATM transactions using Visa- and MasterCard-branded PIN-debit cards may be completed over alternative networks designed originally for electronic funds transfers ("ETFs"). Visa- and MasterCard-branded cards that offer access to an alternative PIN-debit network indicate as much on the reverse side of the card, which bears a service mark belonging

to the alternative network, such as STAR, NYCE Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, CO-OP Financial Services, Shazam Inc., Jeanie, or TransFund.

## B.     Sponsoring Financial Institutions

37.     To accept a Visa- or MasterCard-branded PIN debit card the ATM operator must have access the defendants' PIN-based networks. As members of Visa or MasterCard, card-issuing U.S. banks are granted access to the defendants' PIN-based networks for bank operated ATMs. By contrast, "non-banks," such as independent ATM operators and firms that provide the equipment and physical infrastructure for the authentication, clearing, or settlement of transactions ("processors"), are not Visa or MasterCard members. Before being granted access to the networks, therefore, a non-bank first must be sponsored by a "sponsoring financial institution," or must affiliate itself with a sponsored entity. Sponsoring institutions are Visa or MasterCard member banks that specialize in providing ISOs with access to the Visa and MasterCard PIN-based networks.

## C.     The Horizontal "ATM Restraints"

38.     The member banks of Visa and MasterCard, and in particular the sponsoring institutions, have ceded broad power to Visa and MasterCard to determine a) the conditions under which Visa- and MasterCard-branded PIN-debit cards may be used for ATM transactions, and b) the terms under which ATM operators may access the Visa and MasterCard PIN-debit networks. Visa, MasterCard and their member banks have misused this power to fix the access fee for any transaction at a given ATM or terminal to be no less than the amount charged at that ATM or terminal for a Visa or MasterCard transaction, irrespective of whether the transaction is actually completed over Visa or MasterCard's PIN-debit network and without regard to any cost saving to the ATM operator of obtaining service from one of the alternative PIN-based networks.

39.     The Visa Plus System, Inc. Operating Regulations set forth the following restraint on the exercise of discretion by ATM operators to charge an access fee they deem commercially appropriate:

### 4.10A Imposition of Access Fee

An ATM Acquirer may impose an Access Fee if:

- It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM;

- The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM ....

40.     Similarly, MasterCard's Cirrus Worldwide Operating Rules (September 15, 2010) applicable to the United States Region (Chapter 20) sets forth the same restraint on the exercise of discretion by ATM operators to set access fees as they deem commercially appropriate:

### 7.13.1.2 Non-Discrimination Regarding ATM Access Fees

An Acquirer must not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.

## VI.    HARM TO COMPETITION

41.     The foregoing provisions (hereinafter, the "ATM restraints") suppress competition from PIN-based payment networks that compete with Visa and MasterCard's networks by implementing a uniform horizontal agreement among U.S. banks to fix ATM access fees in a manner that ensures that the access fee for a transaction carried over a competing network is not less than the access fee charged for a transaction carried over Visa or MasterCard's network. The ATM restraints, therefore, effectuate horizontal price fixing that is unlawful *per se*.

42.     The ATM restraints harm competition in numerous ways. The ATM restraints deprive separately owned and in other respects autonomous profit-making businesses—bank and non-bank ATM operators—of the power to make decisions on output or price that deviate from the agreed upon rules. By eliminating or severely restricting independent decision-making by ATM operators, the restraints establish a non-competitive price-setting arrangement that prohibits discounting and prevents ATM operators from setting profit-maximizing prices and from other pricing behavior characteristic of a competitive market. ATM operators may not offer a discount or any other benefit to persuade consumers to complete their transactions over competing, lower cost PIN-based networks, nor may an ATM operator offer a rebate that might circumvent the fixed access fee that complies with the defendants' rules. By restricting their ability to attract customers to lower cost ATM services through lower prices, the ATM restraints put a competitive straightjacket on ATM operators.

43.     The ATM restraints result in supra-competitive prices for ATM services and duplicative and exploitative foreign ATM fees that inflate the retail price of ATM services and discourage consumers from consuming them, lowering output and artificially constraining growth in ATM deployment. But for the ATM restraints, retail prices for ATM services would be lower, the quantity of ATM services demanded would be greater, and economic output would increase.

44.     In a reasonably competitive market, ATM operators would set access fees at a level reflecting the cost of obtaining the network services and other inputs necessary to complete the transaction. ATM operators would set access fees lower for transactions routed through lower-cost ATM networks relative to access fees for transactions routed through higher-cost networks. However, the ATM restraints fix and maintain access fees at the same level

irrespective of which network completes the transaction or what those services actually cost. By preventing ATM operators from charging an access fee that reflects the lower cost of competing networks the ATM restraints shelter the defendants from natural and beneficial price competition that otherwise would be exerted by the other participants in the market. By preventing ATM operators from passing on cost savings to consumers in the form of lower prices, signaling the availability of more efficient, higher quality, or lower priced services, Visa and MasterCard escape the competitive discipline that would otherwise be brought to bear on them by competing PIN-based networks.

45.     Because the ATM restraints break the essential economic link that would exist in a reasonably competitive market between the price a consumer is charged for a service and the cost to the retailer of providing it, they extinguish the incentive of cardholders to demand, and providers of ATM services to provide, lower-cost, more efficient services. By disrupting the ordinary give and take of the marketplace, the ATM restraints suppress competition with rival networks at the point of the transaction, where ATM operators interact directly with consumers, most of whom carry PIN-debit cards capable of initiating ATM transactions over more than one network. Alternative PIN-debit networks are less costly. The ATM restraints prevent ATM operators from offering their customers a discount or benefit for completing a transaction over a network that is less costly to the ATM operator, so consumers cannot be rewarded for using a lower cost and more efficient network.

## VII.    THE RELEVANT MARKETS

### A.    The Relevant Product Market

46.     The relevant product market is the market for ATM services. No cost-effective alternative to ATM services exists and there are few substitutes. Accordingly, a sufficient

number of PIN debit cardholders would not switch away from ATMs to make a small but significant price increase in those services unprofitable. The market for ATM services is a separate and distinct relevant product market for the purposes of 15 U.S.C. § 1.

**B.     The Relevant Geographic Market**

47.     The 50 states of the United States and its districts and territories comprise the relevant geographic market.

## VIII.   DEFENDANTS' MARKET POWER

48.     Through their contracts and agreements with U.S. banks Visa and MasterCard directly wield market power in the relevant market. Visa and MasterCard implement and enforce the ATM restraints and require compliance with them in their contracts, agreements, rules and undertakings with member banks, which, in turn, secure compliance by their customers and suppliers. Visa and MasterCard directly exercise their market power through these arrangements to suppress interbrand competition in the relevant market.

49.     Defendants' direct exercise of market power constrains all of the participants in the ATM industry, including ATM acquirers (member banks that operate ATMs or ISO-sponsoring institutions), processors and technology providers (including the administrators of ATM access fees), and registered ISOs and their affiliates—including the ATM ISOs and affiliates that are the members of the putative class. Defendants actively monitor and vigorously enforce the ATM restraints and participants in the ATM services market must accept and agree to the ATM restraints as a condition of transacting business over defendants' PIN-based networks. Parties that do not adhere to the ATM restraints are penalized or denied access to the network. By their nature, the ATM restraints vest substantial control in Visa and MasterCard over the profit margins of ATM operations.

15

50.     Visa and MasterCard maintain their market power in light of the insurmountable barriers to entry faced by a potential competitor that might seek to achieve comparable consumer acceptance of its PIN-debit card, while at the same time the ATM restraints effectively foreclose competitive ATM networks from competing to carry a larger share of ATM transactions.

## IX.    CLASS ALLEGATIONS

51.     Plaintiffs bring this action under Fed. R. Civ. P., 23(a), (b)(l)(A), (2) and (3), on behalf of themselves and the following class:

> All non-bank operators of ATM terminals, including registered
> ISOs and their affiliates, that operate ATM terminals located in the
> relevant geographic market with the discretion to determine the
> price of the ATM access fee for the terminals they operate and that
> have adhered to the defendants' ATM restraints in transactions
> they have completed at any time on or after October 1, 2007
> ("independent ATM operators").

52.     Plaintiffs estimate that approximately 350 ISOs are registered with Visa and MasterCard, more specific information about which is within the control of defendants. Moreover, most ISOs transact business with numerous ATM-operating affiliates, the precise number of which is not currently known by plaintiffs, but specific information about which is within the control of the sponsoring financial institutions. Accordingly, the identity of the class members readily can be determined from records maintained by defendants, their agents, and the sponsoring financial institutions. The members of the class are so numerous that joinder of all members is impracticable.

53.     Defendants' relationships with the members of the class and defendants' anticompetitive conduct are substantially uniform and the antitrust violation alleged herein affects the ISOs and their affiliates in substantially the same manner. Consequently, common

questions of law and fact will predominate over any individual questions of law and fact. Among the questions of law and fact common to the class are:

a. Whether defendants have established rules precluding differential surcharging by plaintiffs and the class;

b. Whether Visa and MasterCard possess and exercise market power in the relevant markets alleged in this complaint;

c. Whether the ATM restraints prevent plaintiffs and the class from exercising independent commercial discretion in setting ATM access fees in a manner that increases revenue and induces cardholders to utilize more efficient or lower cost payment networks other than Visa and MasterCard's, as would be the case in a competitive market;

d. Whether defendants' ATM restraints are unlawful under Section 1 of the Sherman Act;

e. The proper measure of damages and the amount thereof sustained by plaintiffs and the class as a result of the violations alleged herein;

f. Whether plaintiffs and the class are entitled to injunctive relief.

54. Plaintiffs have claims that are typical of the claims of the class and have no interests adverse to or in conflict with the class. Plaintiffs are represented by counsel competent and experienced in the ATM industry and in prosecution of class action and antitrust litigation and will fairly and adequately protect the interests of the class.

55. There is no foreseeable difficulty managing this action as a class action. Common questions of law and fact exist with respect to all members of the class and predominate over any questions solely affecting individual members. A class action is superior to any other method for the fair and efficient adjudication of this legal dispute because joinder of all members is impracticable, if not impossible. The damages suffered by most of the members of the class are

small in relation to the expense and burden of individual litigation and therefore impractical for such members of the class to individually attempt to redress the antitrust violation alleged herein.

56.     The anticompetitive conduct of defendants alleged herein has imposed a common antitrust injury on the members of the class.

57.     Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

## X.     CLAIM FOR RELIEF

## Sherman Act, Section 1, 15 U.S.C. § 1

### (*Per Se* or Rule of Reason Agreement to Fix Prices)

58.     Through the ATM restraints, defendants have implemented and managed a horizontal agreement to fix prices for ATM services and to protect and shield the defendants' ATM networks from competition from competing networks. Each defendant's ATM restraint independently restrains competition among networks and violates Section 1 of the Sherman Act apart from the existence of the other defendant's ATM restraints.

59.     Each defendant's ATM restraints constitutes an agreement that unreasonably restrains competition in the market for ATM services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The agreements have and will continue to restrain trade in interstate commerce by fixing the price of ATM access fees in a manner that prevents ATM customers from using lower-cost ATM network services and protecting defendants from competition from rivals. By unlawfully insulating defendants' ATM networks from competition, the agreements increase the costs of card acceptance to ATM operators, increase consumer access fees and foreign ATM fees above reasonably competitive levels, reduce output and the

18

number of ATM terminals deployed, harm the competitive process, raise barriers to entry and expansion, and retard innovation and investment.

60. The ATM restraints are not reasonably necessary to accomplish any pro-competitive goal and no pro-competitive benefits result from them. Any efficiency benefit is outweighed by anticompetitive harm and less restrictive alternatives exist by which defendants could reasonably achieve the same or greater efficiency.

61. As a result of these violations of Section 1 of the Sherman Act plaintiffs and the putative class have been injured in their business and property in an amount not presently known, but which is tens of millions of dollars, prior to trebling. Among other effects, the ATM restraints prevent plaintiffs and the proposed class from setting ATM access fees in a manner that would increase their revenue and enlarge their profits, as would be the case in a competitive market.

62. As a result of these violations of Section 1 of the Sherman Act, plaintiffs, the putative class, and the members of the association plaintiff face irreparable injury. The violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs, the putative class, and the association plaintiff have no adequate remedy at law.

## XI.    REQUEST FOR RELIEF

WHEREFORE, plaintiffs pray that final judgment be entered against each defendant granting the following relief:

A.    A declaration that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and that reasonable notice of this action, as

provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to all members of the plaintiff class;

B.     A finding that the combinations and agreements alleged in the complaint be adjudged and decreed to be unreasonable restraints of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     An injunctive order and decree requiring each defendant to eliminate the ATM restraints and be prohibited from otherwise enforcing them;

D.     An injunctive order and decree that each defendant be permanently enjoined from fixing or specifying the access fee for ATM transactions or implementing other rules or policies having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

E.     An order prohibiting each defendant from prohibiting or preventing reasonable means for cardholders to choose the network over which their ATM transactions will take place and to fund and undertake programs to inform consumers and ATM operators of their rights respecting cardholders' and ATM operators' choice of network routing;

F.     The plaintiffs and each member of the class recover three-fold their damages as provided by law as determined to have been sustained by each of them (using such damage methodologies as may be appropriate at trial), and for judgments in favor of plaintiffs and the plaintiff class be entered against defendants and each of them in that amount plus interest; and

G.     The plaintiffs and the plaintiff class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H.     The plaintiffs, the plaintiff class and the association plaintiff be granted such other relief as may be appropriate as the court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated: October 12th , 2011

Brooks E. Harlow, Esq.
David A. LaFuria, Esq. (D.C. Bar #417079)
Lukas, Nace, Gutierrez & Sachs, LLP
8300 Greensboro Drive, Suite 1200
McLean, VA 22101
Tel: (703) 584-8678

Jonathan L. Rubin (D.C. Bar # 353391)
Rubin PLLC
1250 24th Street, N.W., Ste. 300
Washington, D.C. 20037
Tel: (202) 776-7763
Fax: (877) 247-8586
E-mail: jr@rubinpllc.com

*Consulting counsel*:

Don A. Resnikoff, Esq. (D.C. Bar# 386688)

*Attorneys for plaintiffs*