**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
NATIONAL ATM COUNCIL, INC., *et al.*,  )
                                        )
            Plaintiffs,                 )
v.                                      )        CA No. 1:11-cv-01803 (ABJ)
                                        )
VISA INC., *et al.*,                    )
                                        )
            Defendants.                 )
_____        )
                                        )
ANDREW MACKMIN, *et al.*,               )
                                        )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      )        CA No. 1:11-cv-01831 (ABJ)
                                        )
VISA INC., *et al.*,                    )
                                        )
            Defendants.                 )
_____        )
                                        )
MARY STOUMBOS,                          )
                                        )
            Plaintiff,                  )
v.                                      )        CA No. 1:11-cv-01882 (ABJ)
                                        )
                                        )
VISA INC., *et al.*,                    )
                                        )
            Defendants.                 )
_____        )

## <u>MEMORANDUM OPINION</u>

Sometimes the bank is just too far away.  So customers in need of cash will avail

themselves of automatic teller machines ("ATMs") at banks other than their own, or at

convenience stores, gas stations, nail salons, and numerous other places.  When they do, they

will be advised:  "This ATM will charge a fee of $2.50 for this transaction.  This fee is in

addition to any fees which may be charged by your financial institution.  If you agree to this fee, press YES.  If you wish to cancel this transaction, press NO."  And they will be required to accept the fee before the machine will execute the transaction.  This case involves those fees.[1]

Plaintiffs in three separate actions claim that the ATM access fee pricing requirements that Visa and MasterCard have imposed on banks and ATM operators violate Section 1 of the Sherman Antitrust Act.  15 U.S.C. § 1 (2006).  Specifically, plaintiffs complain about contract provisions that prohibit ATM operators from charging fees for transactions processed over Visa and MasterCard networks that are higher than the lowest access fees charged for transactions processed over other payment networks.  Plaintiffs claim that through these provisions, Visa and MasterCard suppress competition from other ATM networks, force ATM operators to charge consumers supra-competitive access fees, and harm competition in the market for ATM networks.  Plaintiffs in *National ATM Council v. Visa* ("*NAC*"), No. 1:11-cv-01803 (ABJ), and *Stoumbos v. Visa*, No. 1:11-cv-01882 (ABJ), claim that Visa and MasterCard conspired with unnamed banks to execute the scheme, while plaintiffs in *Mackmin v. Visa,* No. 1:11-cv-01831 (ABJ), have brought conspiracy claims against Bank of America, Wells Fargo, and J.P. Morgan Chase, as well as Visa and MasterCard.[2]

---

1    Readers hoping for an opinion outlawing the fees entirely can stop here; this case has nothing to do with the legality of the fees in general, but rather, the manner in which they are calculated.

2    Consumer plaintiffs also allege violations of various state antitrust and unfair competition laws and of state consumer protection laws.  *Mackmin* Compl. ¶¶ 112–52; *Stoumbos* Compl. ¶¶ 53–102.

Defendants in all three cases have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3]

It is well-established that when considering a 12(b)(6) motion, the Court must accept the facts set out in the complaint as true. But the Court is not bound to assume the truth of a party's conclusions. In this case, the complaints bristle with indignation, but when one strips away the conclusory assertions and the inferences proffered without factual support, there is very little left to consider. The Court will therefore grant the motions to dismiss – without prejudice – on two grounds. First, the complaints allege insufficient facts to support the allegations that plaintiffs suffered any injury, and the law does not support their argument that such allegations are unnecessary in an antitrust case. Second, plaintiffs have not set forth sufficient facts to support their claim that there was a horizontal conspiracy. Notably absent from each of the complaints are facts showing the existence of an agreement, the essential element of any conspiracy. Given the insufficiency of the federal claims, the Court declines to consider the state law claims, and the complaints will be dismissed.

## BACKGROUND

All three complaints raise the same general claim: that Visa and MasterCard include provisions in their contracts with banks and ATM operators that require ATM operators using the Visa or MasterCard ATM networks to set consumer access fees for transactions on those networks that are no higher than the lowest access fees charged for transactions processed over

---

3       Visa and MasterCard filed a single joint motion to dismiss all three cases. *See* Visa and MasterCard Defs.' Mot. to Dismiss, *NAC v. Visa* [Dkt. # 24], *Mackmin v. Visa* [Dkt. # 40], *Stoumbos v. Visa* [Dkt. # 17] (collectively "Visa/MC Mot."). The bank defendants filed a joint motion to dismiss in *Mackmin. See* Bank Defs.' Mot. to Dismiss, *Mackmin v. Visa* [Dkt. # 39] ("Banks' Mot."). The parties also provided additional briefing on the issue of injury in fact. *See* Defs.' Suppl. Br., *NAC v. Visa* [Dkt. # 29], *Mackmin v. Visa* [Dkt. # 51], *Stoumbos v. Visa* [Dkt. # 23]; Consumer Pls.' Suppl. Br., *Mackmin v. Visa* [Dkt. # 52], *Stoumbos v. Visa* [Dkt. # 24]; NAC's Suppl. Br., *NAC v. Visa* [Dkt. # 30].

other ATM networks. *NAC v. Visa* First Am. Class Action Compl. ("*NAC* Compl.") [Dkt. # 22]
¶¶ 41–43; *Mackmin v. Visa* First Am. Class Action Compl. ("*Mackmin* Compl.") [Dkt. # 24] ¶¶
69–70; *Stoumbos v. Visa* Corrected Class Action Compl. ("*Stoumbos* Compl.") [Dkt. # 3] ¶¶ 31–
32. Put another way, ATMs that accept Visa- or MasterCard-branded cards cannot charge
consumers using those cards more for their transactions than they charge consumers whose
transactions are processed on other ATM networks. Visa and MasterCard maintain that the
provisions in question simply establish a ceiling on ATM access fees, which benefits all
consumers. But plaintiffs characterize the provision as setting not a ceiling, but a floor: a level
beneath which prices for transactions processed on other networks cannot be discounted. All
three complaints assert that these access fee requirements injure competition in violation of
Section 1 of the Sherman Antitrust Act.[4]

## I.      ATMs, Networks, and ATM Transactions

To understand the parties' claims and defenses, it is necessary to understand how ATMs
operate and how funds flow in an ATM transaction. ATMs enable consumers to conduct
banking transactions, such as withdrawing cash and obtaining account balances, without entering
the bank. *Stoumbos* Compl. ¶¶ 4, 7. Consumers activate the ATMs with personal identification
number ("PIN")-based payment cards, issued by their banks or depository institutions, that link

---

[4]     The Court notes at the outset that its dismissal of plaintiffs' antitrust claims should not be
interpreted as a ruling accepting the defendants' argument that the access fee requirements are
actually procompetitive. The Court did not reach the question of whether the challenged contract
provisions are acceptable because they are cast in terms of a ban on charging consumers more
when they use Visa and MasterCard networks rather than as a restriction on charging them less
to use other networks. Nor has the Court expressed an opinion on defendants' argument that the
access fee requirements can be aptly compared to "most favored nation" clauses that have been
upheld by courts in other cases. The defects in these complaints compel the dismissal of the
pending claims even if there are anti-competitive aspects to the arrangements in question.

to their accounts.[5]  *NAC* Compl. ¶¶ 35–37; *Mackmin* Compl. ¶¶ 48, 52; *Stoumbos* Compl. ¶¶ 6–7, 25.

ATMs can be owned and operated by banks or by independent operators.  To process a consumer's ATM transaction, an ATM must access a network that can communicate with the consumer's bank to complete the transaction.  Defendants Visa and MasterCard each operate ATM networks that transmit these communications, as do other networks, such as STAR, Pulse, NYCE Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, CO-OP Financial Services, Shazam Inc., Jeanie, and TransFund.  *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶¶ 64, 66; *Stoumbos* Compl. ¶¶ 28–29.

The network used to process a particular transaction is determined by two factors:  which networks the consumer's PIN card can access and which networks the ATM can access.  Some PIN cards transmit transactions over a single payment network only, while others can send transactions over more than one network.  *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶ 66; *Stoumbos* Compl. ¶ 28.  The reverse side of each card shows the service marks of the payment networks the card can access.  *NAC* Compl. ¶ 38; *Mackmin* Compl. ¶ 66; *Stoumbos* Compl. ¶ 28.  For example, a PIN card bearing the Visa, STAR, and NYCE service marks can only transmit ATM requests over the Visa, STAR, and NYCE networks, so that card can only be used on ATMs with access to those networks.

Whether an ATM can access a particular network depends on whether the ATM operator has a contract with the network provider.  Banks that issue Visa- or MasterCard-branded PIN cards are automatically granted access to the Visa or MasterCard networks.  Independent ATM operators who want their ATMs to have access to the Visa or MasterCard networks must be

---

5    Banks and depository institutions that issue PIN-based payment cards are sometimes referred to as "issuing banks."

sponsored by a "sponsoring financial institution" – a Visa or MasterCard member bank – or must affiliate with a sponsored entity. *NAC* Compl. ¶ 39, *Mackmin* Compl. ¶ 64; *Stoumbos* Compl. ¶ 29. Both independent and bank-owned ATM operators typically contract with multiple networks so their ATMs can serve as many consumers as possible.

Consumers can access funds and conduct transactions using ATMs at their own bank, at other banks, and at non-bank locations, such as convenience stores, shopping malls, and airports. When a consumer uses an ATM to obtain cash from her account, the ATM sends the transaction request over a network and, if the requested funds are available, the ATM provides the cash to the consumer. Thanks to modern technology, all of this typically happens within a few seconds. When the consumer initiates the transaction on an ATM operated by an entity other than her own bank, that ATM's operator – whether a different bank or an independent operator – usually charges the consumer an ATM access fee for the transaction. *NAC* Compl. ¶ 37; *Mackmin* Compl. ¶¶ 2–3; *Stoumbos* Compl. ¶¶ 8, 27. These are the access fees at issue in the three lawsuits before the Court.[6]

## II. The Parties

The three groups of plaintiffs represent different participants in ATM transactions. Plaintiffs in *NAC v. Visa* are the National ATM Council, a trade association that represents owners and operators of independent (i.e., non-bank owned) ATMs, along with thirteen owners and operators of independent ATMs. *NAC* Compl. ¶¶ 7, 9–21. Plaintiffs in *Mackmin v. Visa* are four consumers who have used ATMs, whether independent or bank-owned, and have paid ATM access fees as a result. *Mackmin* Compl. ¶¶ 12–15. Plaintiff in *Stoumbos v. Visa* is a consumer

---

6       A consumer may also be required to pay a fee charged by the consumer's own bank for using an ATM not operated by the bank, sometimes called a foreign ATM access fee. These foreign ATM access fees are not at issue in these lawsuits. *NAC* Compl. ¶ 37; *Mackmin* Compl. ¶ 3; *Stoumbos* Compl. at 8 n.1.

who has paid several ATM access fees specifically in connection with transactions at independent ATMs. *Stoumbos* Compl. ¶ 11.

Defendants Visa and MasterCard are each independent, publicly-traded corporations that issue PIN cards under their respective brands and process ATM transactions on their networks. Visa operates the Visa, PLUS, and Interlink payment networks and issues PIN cards that carry its Visa, Visa Electron, Interlink, or PLUS service mark.   MasterCard operates the MasterCard Worldwide Network and issues PIN cards that carry its MasterCard, Maestro, or Cirrus service mark.   Before they became independent, publicly-traded corporations in 2008 and 2006, respectively, Visa and MasterCard were each associations owned and operated by member banks. *NAC* Compl. ¶¶ 30, 33–34; *Mackmin* Compl. ¶¶ 44–45, 50–51; *Stoumbos* Compl. ¶¶ 20, 25–26.

The *Mackmin* plaintiffs have also sued Bank of America, N.A.; NB Holdings Corp.; Bank of America Corp. (collectively, "Bank of America"); Chase Bank USA, N.A.; JPMorgan Chase & Co.; and JPMorgan Chase Bank, N.A. (collectively, "Chase"); and Wells Fargo & Co. and Wells Fargo Bank, N.A. (collectively, "Wells Fargo").   These defendants are national retail banks that belong to the Visa and MasterCard networks. *Mackmin* Compl. ¶ 43.

## III.    Plaintiffs' Claims

Plaintiffs complain that Visa and MasterCard violate Section 1 of the Sherman Antitrust Act by including provisions in their agreements with banks and ATM operators that prohibit the operators from charging higher access fees for transactions over the Visa or MasterCard networks than they charge for transactions on any other network.   *NAC* Compl. ¶¶ 41–42; *Mackmin* Compl. ¶¶ 69–70; *Stoumbos* Compl. ¶¶ 31–32.   This means that an ATM operator cannot charge a consumer whose PIN card only operates on the MasterCard network a $2.00

ATM access fee on a particular ATM terminal, while charging a consumer whose PIN card operates on the NYCE network a $1.50 access fee on that same terminal.

According to all three complaints, these agreements harm competition.  By preventing ATM operators from charging different ATM access fees to consumers based on the networks their PIN cards can access, plaintiffs say, these agreements effectively prohibit operators from discounting, rebating, or directing consumers to less expensive networks, *NAC* Compl. ¶¶ 44–45; *Mackmin* Compl. ¶¶ 74–75; *Stoumbos* Compl. ¶ 36.  Thus, it is alleged that the agreements cause consumers to pay "supra-competitive" fees, that is, fees higher than a competitive market would bear, for ATM transactions, *NAC* Compl. ¶ 46; *Mackmin* Compl. ¶ 76; *Stoumbos* Compl. ¶ 39, and insulate Visa and MasterCard from the rigors of competition from other payment networks. *NAC* Compl. ¶ 43; *Mackmin* Compl. ¶ 80; *Stoumbos* Compl. ¶ 34.  Plaintiffs claim that but for these contract clauses, price competition would ensue in the ATM transaction market, which would result in lower ATM access fees for consumers.  *NAC* Compl. ¶ 47; *Mackmin* Compl. ¶ 76; *Stoumbos* Compl. ¶ 39.  The *NAC* complaint, filed by independent ATM operators, also claims that the access fee rules enable Visa and MasterCard to "charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, and to steer excessive and disproportionate compensation for ATM transactions to their member banks." *NAC* Compl. ¶ 46.

On January 30, 2012, Visa and MasterCard and the bank defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) on multiple grounds.  The network defendants asserted that plaintiffs failed to allege sufficient facts to establish the existence of a conspiracy, an antitrust injury, or a violation of D.C. or state antitrust laws.  Visa/MC Mot. at 9– 24.  The bank defendants asserted that plaintiffs have not pled facts to support the alleged *per se*

violation of Section 1 of the Sherman Act, the allegation of a horizontal agreement, or an antitrust injury.  Banks' Mot. at 8–22.  Subsequently, in response to the Court's request, the parties provided supplemental briefing on the issue of injury in fact.  *See* Defs.' Suppl. Br., *NAC v. Visa* [Dkt. # 29], *Mackmin v. Visa* [Dkt. # 51], *Stoumbos v. Visa* [Dkt. # 23]; Consumer Pls.' Suppl. Br., *Mackmin v. Visa* [Dkt. # 52], *Stoumbos v. Visa* [Dkt. # 24]; and NAC's Suppl. Br., *NAC v. Visa* [Dkt. # 30].

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (applying this standard in an antitrust case in which the allegations of conspiracy were found to be insufficient because the plaintiffs had not set forth enough facts to state a plausible claim on its face).  A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has

9

acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Id.* at 679, quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original) (internal quotation marks omitted).   A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.* at 678, quoting *Twombly*, 550 U.S. at 555, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id.*

## ANALYSIS

### I.        The Sherman Antitrust Act

Plaintiffs allege a violation of Section 1 of the Sherman Antitrust Act.  Section 1 declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1 (2006).   Thus, a violation involves two critical components:  the combination or agreement, and the restraint of trade.

The Supreme Court has made clear that a restraint of trade violates Section 1 of the Act if it causes "antitrust injury, which is to say, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The antitrust injury must "stem[] from a

competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).[7]

The federal government is authorized to enforce the antitrust laws by seeking civil or criminal sanctions. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 652 (1985). And under Section 4 of the Clayton Act, private parties who have been injured by Sherman Act violations may also seek relief in court. 15 U.S.C. § 15(a) (stating that a private "person injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.").[8]

A.      **The Complaints Must Allege Both Prongs of Antitrust Standing**

Although the language of Clayton Act Section 4 is broadly written, the "potency of the remedy implies the need for some care in its application," and not every party affected by an antitrust violator's "ripples of harm" is allowed to sue. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001), quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 476–77 (1982) (quotation marks omitted). To have standing to sue on an antitrust claim, a private plaintiff must show two things: (1) that the defendant's alleged wrongdoing has caused

---

7       Restraints that, for example, result in low prices "benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition" and "cannot give rise to antitrust injury." *Atl. Richfield Co.*, 495 U.S. at 340; *see also Dial A Car v. Transp., Inc.*, 884 F. Supp. 584, 591 (D.D.C. 1995) (dismissing claim for lack of antitrust injury because "[d]efendants' conduct may have resulted in *lower* prices and *more* competition in the market; it has not resulted in *higher* prices and *less* competition"). Thus, for a complaint to survive a motion to dismiss, plaintiffs must allege sufficient facts in their complaints for the Court to conclude that defendants' actions plausibly resulted in some harm to competition. *See Atl. Richfield Co.*, 495 U.S. at 344.

8       The Clayton Act includes the Sherman Act as one of the "antitrust laws." *See* 15 U.S.C. § 12(a). Also, a person "threatened [with] loss or damage by a violation of the antitrust laws" can seek injunctive relief under section 16 of the Clayton Act. 15 U.S.C. § 26.

him to suffer an injury in fact that affects his business or property; and (2) that the injury is the kind of injury the antitrust laws were intended to prevent.

While allegations that competition has been restrained may satisfy the second prong, that circumstance alone is not enough to confer standing to sue under Section 4 of the Clayton Act. A plaintiff must personally suffer the harm.   In that aspect, the injury-in-fact prerequisite in antitrust cases mirrors the Article III constitutional standing requirement that all plaintiffs in federal cases must satisfy.[9]   Indeed, the D.C. Circuit recently overturned a grant of summary judgment in an antitrust matter because the lower court failed to analyze whether the plaintiff had demonstrated an Article III injury in fact.   *Dominguez*, 666 F.3d at 1362 (D.C. Cir. 2012) (rejecting the notion that injury in fact can simply be inferred from anticompetitive acts, stating that the fact "[t]hat the merits of a particular claim may be clear is no reason to avoid the constitutionally required inquiry into this limit on our jurisdiction"); *see also Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1255–56 (9th Cir. 2008) (finding no Article III injury in fact in an antitrust case because the defendant did not show he personally paid a higher price for a book or that he himself experienced any reduced selection of titles, poorer service, or any other potentially conceivable form of injury).

---

9        "[E]very federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute."   *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012), quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies."   *Allen v. Wright*, 468 U.S. 737, 750 (1984).   "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine."   *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen*, 468 U.S. at 750.   Within Article III standing, every plaintiff in federal court bears the burden of establishing the three elements that make up the "irreducible constitutional minimum" of Article III standing:   injury in fact, causation, and redressability. *Dominguez*, 666 F.3d at 1362.   Injury in fact requires a plaintiff to allege an injury that is both concrete and particularized and actual or imminent, rather than speculative or generalized.   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Similarly, the first prong of the antitrust standing inquiry requires plaintiffs to allege that the defendants' conduct caused or threatened injury to their own business or property. *Andrx*, 256 F.3d at 806 ("As in any civil action for damages, the plaintiff in a private antitrust lawsuit must show that the defendant's illegal conduct caused its injury.  The plaintiff's first step is to plead an injury-in-fact . . . to business or property.") (citations omitted).

By contrast, the second requirement of antitrust injury looks at the marketplace in general.  It requires plaintiffs to allege an injury that is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969) (internal quotation marks omitted).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Id.*  Although both standing requirements involve questions of injury, they present two separate inquiries. *See Atl. Richfield Co.*, 495 U.S. at 339 n.8 (rejecting a theory that equates injury in fact with antitrust injury:  "antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity").

Thus, a private plaintiff's antitrust claim may proceed only if the complaint satisfies both inquiries under the conventional Federal Rule of Civil Procedure 8(a) pleading standards that govern "in all civil actions." *Iqbal*, 556 U.S. at 684, quoting Fed. R. Civ. P. 1 (quotation mark omitted).

### B.    The Complaints Must Also Allege an Agreement or Conspiracy

The Supreme Court has repeatedly made it clear that the existence of an agreement or conspiracy is an essential element of a Sherman Act violation.

> Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful.

*Twombly,* 550 U.S. at 553–54 (citations, edits, and internal quotation marks omitted). So, to plead a violation of Section 1 of the Sherman Act, plaintiffs must allege not only the antitrust injury, but also the existence of an agreement or conspiracy, or facts sufficient to support the inference of an agreement or conspiracy.

While the standard articulated in *Twombly* for the sufficiency of a complaint is recited in practically every motion to dismiss filed in every sort of action in this court, it has particular relevance here. In *Twombly*, the Court specifically undertook to address what a plaintiff must plead in order to state a Sherman Act claim, and it asked "whether a §1 complaint can survive a motion to dismiss when it alleges that [the defendants] engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." *Id.* at 548−49. The answer to the question was no.

The Court ruled that the Federal Rules of Civil Procedure require a plaintiff to put some meat on the bones from the outset: "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (edits and internal quotation marks omitted). Allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent

action." *Id.* at 557.   The complaints must include "further circumstance pointing toward a meeting of the minds." *Id.*   The Court concluded that the *Twombly* plaintiffs' allegations of agreement and conspiracy were insufficient because the claims rested "on descriptions of parallel conduct and not on any independent allegation of actual agreement." *Id.* at 564.   Therefore, the plaintiffs had not set forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Notwithstanding plaintiffs' insistence that there is something special about antitrust litigation that exempts this case from the usual pleading requirements, the Court is bound to follow *Twombly's* unambiguous guidance when it analyzes the three complaints before it.

## II.     The Complaints Do Not Allege Injury in Fact

Plaintiffs acknowledge in their briefs that they must establish injury in fact as part of antitrust injury.   *See* Consumer Pls.' Suppl. Br. at 3; NAC's Suppl. Br. at 1.   They take the position, though, that by alleging anticompetitive conduct, they have more than satisfied the requirements for pleading antitrust injury in fact.   *See, e.g.*, NAC Suppl. Br. at 8; Tr. of Hr'g on Mot. to Dismiss ("Tr.") [Dkt. # 32] at 81, Sept. 5, 2012 ("[I]f you can establish that competition has been harmed . . . there are certain injuries that flow from that . . . .   It is not required in an antitrust complaint to plead the economics textbook that goes in between the allegation of the competition injury and the actual injury . . . ."); Tr. at 100 (*Mackmin* counsel citing *Cardizem CD* for proposition that an allegation of anticompetitive activity establishes injury in fact and antitrust injury "all in one"); *see also* Tr. at 87, 96, 114–16 (arguing that plaintiffs were injured because "[t]hey paid an ATM access fee in a restrained market" that was greater than the price would be otherwise:   "What's that other price? . . . It's a price in what's called the but for world.").

15

But a "'naked assertion' of antitrust injury . . . is not enough; an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) (en banc), quoting *Twombly*, 550 U.S. at 557.  Antitrust injury involves a two-step showing, *see Andrx*, 256 F.3d at 806, and none of the cases cited by the plaintiffs supports the proposition that the injury-in-fact step can be merged with the allegations of competitive harm.

In *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896 (6th Cir. 2003), the court stated that a "private antitrust plaintiff, *in addition to having to show injury-in-fact* and proximate cause, must allege, and eventually prove, antitrust injury." *Id.* at 909 (emphasis added) (internal quotation marks omitted).  The court specifically found that facts the *Cardizem CD* plaintiffs pled were sufficient to satisfy the injury-in-fact requirement:  in that case, purchasers of heart medication alleged that an agreement between the brand drug manufacturer and a generic manufacturer prevented any generic from entering the market and thereby deprived plaintiffs of a less expensive generic alternative.  *Id.* at 910.  The court ruled that plaintiffs suffered injury in fact because they incurred the out-of-pocket expense of the price difference between the brand drug and a generic version.  *Id.* at 904–05.[10]

Consumer plaintiffs also cite *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ("*LCD*"), for the proposition that to plead antitrust injury, all a claimant must allege is that he paid for a product at a supra-competitive price.  *See* Tr. at 102–04 ("[A]ll we need to do as consumers is to say that . . . there's a restraint in the marketplace, the marketplace is broken.").  But that is not what the *LCD* case holds.  The court simply ruled that it

---

[10]    The court also emphasized, "Our conclusion that the Agreement was a *per se* illegal restraint of trade does not obviate the need to decide whether the plaintiffs adequately alleged antitrust injury."  *Cardizem CD*, 332 F.3d at 909 n.15.  And in that case, the "but for" allegations satisfied the "antitrust injury" prong of the standing test, but they were not the sole foundation for the "injury in fact" prong.

was not necessary at the pleading stage to allege the exact *measure* of damages.  *LCD*, 586 F.

Supp. 2d at 1124.  The court found that the *LCD* plaintiffs sufficiently alleged that overcharges

are in fact passed on to consumers "and that such overcharges can be traced through the

relatively short distribution chain."  *Id.*  In other words, the *LCD* plaintiffs provided factual

allegations to demonstrate that consumers were being affected, so the complaint satisfied the

injury-in-fact requirement.[11]

Plaintiffs pointed the court to *Ross v. Bank of America, N.A. (U.S.A.)*, 524 F.3d 217 (2d

Cir. 2008), and urged it to conclude that an allegation of competitive harm was sufficient.

Consumer Pls.' Suppl. Br. at 6.  But *Ross* does not diminish the requirement that plaintiffs plead

injury in fact.  The harm plaintiffs alleged that they suffered in that case was that they were

forced to accept arbitration clauses in credit card agreements with their banks.  *Ross*, 524 F.3d at

223 (finding that the cardholders' assertion that they were "deprived of any meaningful choice

on a critical term and condition of their general purpose card accounts" satisfied injury-in-fact

requirement").

Thus, in *Cardizem CD*, *LCD*, and *Ross*, there was no factual or logical gap  between the

complained-of conduct and the alleged harm.  In those cases, the complaints provided sufficient

facts to support an inference that the defendants' concerted actions caused injury to the plaintiffs'

business or property.  That is not the case in the three complaints before the Court.

---

[11]    The *LCD* complaint also included significant detail about the market and the defendants'
complex and unusual pricing behavior that could not be attributable to supply and demand.  *See
id.* at 1115–16 (describing detailed allegations of declining LCD panel prices before the
conspiracy, due to advances in technology, improving efficiencies, and new market entrants, and
post-conspiracy pricing characterized by unnatural and sustained price stability, periods of
substantial price increases, and a compression of price ranges for the products).  There is nothing
comparable in the complaints before the Court.  Plaintiffs also point to *Chattanooga Foundry &
Pipe Works v. City of Atlanta*, 203 U.S. 390 (1906), to support their argument.  Tr. at 115.  But
the issue in that case was which statute of limitations would apply.  *Chattanooga*, 203 U.S. at
397.  The case does not analyze what facts plaintiffs must allege to plead injury in fact.

A.     **The Consumer Complaints**

Plaintiffs in the *Mackmin* case represent consumers who have used both independent and bank-owned ATMs, while plaintiff Mary Stoumbos has sued only on behalf of consumers who use independent ATMs.  *Mackmin* Compl. ¶¶ 12–15, 89; *Stoumbos* Compl. ¶¶ 11, 22.  Both complaints allege that plaintiffs have been forced to pay inflated, "supra-competitive" ATM access fees as a result of the Visa and MasterCard access fee rules, because without the access fee rules, ATM operators could send transactions to "lower cost networks" and would pass that cost savings on to consumers in the form of lower access fees.  *Mackmin* Compl. ¶¶ 4–5; *Stoumbos* Compl. ¶¶ 33, 37–38, 40.  But the consumer plaintiffs do not allege facts to support the necessary allegation that they were personally affected by those circumstances, or that the access fees charged by the ATM operators were actually inflated.

1.     **The *Mackmin* complaint**

The *Mackmin* complaint starts out by explaining how ATM transactions work.  Paragraph 3 explains that the ATM access fee at the heart of the dispute is paid by the customer.  *Mackmin* Compl. ¶ 3.  Paragraphs 1, 4, and 5 set out the conclusion that these fees are inflated, and that "[b]y prohibiting [ATM operators] from offering more attractive terms to consumers who use lower cost, competing networks, Visa and MasterCard are able to maintain their market position."  *Id.* ¶¶ 1, 4–5.  But the complaint never follows up with any factual detail that would indicate that consumers have any ability to "use" competing networks:  there is no allegation that any choices can be offered at the ATM, and there is a critical lack of factual support for the notion that other networks cost less.

While paragraph 59 explains that the customer pays the access fee to the ATM operator and a foreign ATM fee to his own bank, and "the card-issuer bank" pays a switch fee to the ATM network and an interchange fee to the owner of the foreign ATM, there is no allegation

that anyone pays a fee to the networks. *Id.* ¶ 59. So what is the complaint's often-repeated phrase "lower cost network" supposed to mean? The complaint charges that the challenged rules require ATM access fees to be the same for any transaction "irrespective of whether the transaction is actually completed over Visa or MasterCard's PIN Debit network, and without regard to any savings incurred by the ATM owner from obtaining services from one of the alternative PIN-based networks." *Id.* ¶ 68. "Any" savings? Are there savings? None are alleged. Nothing in the complaint explains whether or how the network utilized affects the ATM operator's costs.

Similarly, there are no facts from which a reasonable person could draw the conclusion in paragraph 74 that the rules create an arrangement "that prohibits discounting, directing consumers to less expensive competitor networks, and other pricing behavior characteristic of a free and competitive market." *Id. ¶ 74.* What is stopping ATM operators from offering customers who use their machines a discount? The complaint asserts that "[i]n a reasonably competitive market, ATM Operators would set ATM Access Fees at a level reflecting the cost of obtaining the network services and other inputs necessary to complete the transaction," *id.* ¶ 77, and that by requiring that access fees be the same regardless of the network utilized, the "restraints break the essential economic link that would exist in a reasonably competitive market between the price a consumer is charged for a service and the cost to the seller of providing it," *id.* ¶ 79. What is missing is any discussion of what the ATM operator's costs are, and whether they change if the operator uses a Visa or MasterCard network or an alternative network. Those missing facts are fundamental, and without them, there is no basis for the conclusions in paragraph 87 that the access fees are "inflated" or "supra-competitive."

There are also significant problems with injury in fact here because the *Mackmin* plaintiffs do not articulate how these restrictions affected them in particular.[12]   The complaint alleges that each of the named plaintiffs has paid at least one ATM fee at some unspecified time or place.  *Id.* ¶¶ 12–15.  But it does not state whether the plaintiffs were conducting transactions at an ATM where an alternative network was even available.  The *Mackmin* plaintiffs allege that "some" ATM transactions using Visa- or MasterCard-branded cards may be completed over alternate networks – transactions initiated with cards displaying the service marks of other networks on the reverse side.  *Id.* ¶ 66.  But there are no allegations that any of the named plaintiffs actually carry PIN cards in their wallets that can be used on alternative networks, or whether those particular networks, if any, were offered at the ATMs where plaintiffs conducted their transactions and paid their fees.

### 2.   The *Stoumbos* complaint

Plaintiff Stoumbos also begins the factual background section of her complaint with a description of how ATM transactions work and how they are priced.  *Stoumbos* Compl. ¶¶ 27–29.  In paragraph 28, Stoumbos states that "[s]ome ATM transactions using Visa- and MasterCard-branded PIN-debit cards may be completed over alternate networks" and that the PIN cards that offer this access bear the other service marks on the back of the card.  *Id.* ¶ 28.  But there is no allegation in the complaint that Stoumbos herself had such a card.  She does

---

12      According to the information provided in the complaints, the complained-of contract provisions do not necessarily affect all ATM transactions.  First of all, the access fees are only imposed when a consumer is somewhere other than at his own bank.  *Mackmin* Compl. ¶ 56.  Second, the rules only affect transactions made with PIN cards that have multiple service marks and permit the bearer to utilize alternative networks.  Otherwise – whether it is the consumer or the ATM operator who selects the network – there is no option available to choose an alternative network and obtain the alleged "cost savings" even if they exist.  Third, the consumer complaints allege that the "overwhelming" majority of the cards issued are Visa or MasterCard-brand cards.  *Mackmin* Compl. ¶ 55; *Stoumbos* Compl. ¶ 45.  And customers obtaining Visa and MasterCard transactions must be afforded the benefit of the lowest access fee an operator is willing to charge.

allege that she used an independent ATM, but there is no indication of whether she used one that was connected to any alternative network, or whether she used an ATM that could have accessed whatever particular alternative network may have been available to her. These omissions mean that there is no link between the alleged harm to competition and the plaintiff's pocketbook.

And what is said about the elusive discounts that supposedly are not being passed on to consumers due to the restraints imposed by the defendants? The *Stoumbos* complaint alleges that Visa and MasterCard force ATM operators to charge an access fee for all transactions that is no less than the fee charged at that ATM for Visa and MasterCard transactions. *Id.* ¶ 30. According to the plaintiff, they do this "irrespective" of whether the transaction is actually completed over the Visa or MasterCard networks, and "without regard to any actual or potential cost savings to the ATM operator" of using an alternative network. *Id.* ¶ 33.

As was the case with the *Mackmin* complaint, this language is telling. "Potential" cost savings? The complaint does not allege any facts to indicate that alternate networks actually provide the service at a lower cost or that completing an ATM transaction over an alternate network would give rise to *any* savings for the ATM operator. So, the sentence in paragraph 33 stating that plaintiffs are harmed because "they are forced to pay supra-competitive ATM Access Fees" is an unsupported conclusion. So is: "The ATM restraints operate to prohibit discounting by competing ATM operators to reflect the variability of costs of using competing networks." *Id.* ¶ 34. The problem with that statement is that there are no facts alleged that show that there *is* any "variability of costs of using competing networks." These sorts of allegations are repeated throughout the complaint. *See, e.g.*, *id.* ¶ 36 (alleging that the rules "prohibit[] discounting" and "prevent[] Independent ATM operators from setting profit-maximizing prices and . . . other pricing behavior characteristic of a competitive market"); *id.* ¶¶ 38–40 (alleging that consumers

"are forced to pay higher ATM Access Fees than they otherwise would if there were competition in the market," the ATM access fees "result in supra-competitive ATM Access Fees and artificially constrain growth in ATM deployment, and that "[c]ompetition between ATM operators would pass these lower costs on to Plaintiffs").

In the midst of these conclusory recitations, Stoumbos does include one sentence that claims, "Alternative PIN-debit networks are less costly." *Id.* ¶ 41. This assertion hardly suffices to support the inferences the Court is being asked to draw in this case. Less costly to whom? Less costly to operate? Less costly to use? Again, nowhere in this complaint does plaintiff allege that the networks – either Visa and MasterCard or the competing networks – charge anyone for using their facilities at all.

Stoumbos also asserts that the contract provisions are unlawful because "[i]ndependent ATM operators may not offer a discount or other benefit to persuade consumers to complete their transactions over competing, lower cost . . . networks." *Id.* ¶ 36; *see also id.* ¶ 37 (alleging that the rules deter ATM operators from "steering" transactions to other networks, which "hinders the growth and development of more efficient, lower cost competing ATM networks"). But how can a customer be "steered?" There are no factual allegations that establish that even a persuaded consumer would have any ability to affect which network the operator is using. Moreover, none of the allegations support the conclusion that ATM operators cannot discount to compete with each other. Plaintiff does not allege that there is anything barring ATM operators from using the so-called lower cost networks and lowering their prices across the board to attract consumers to their machines.

Paragraph 37 contends that "[a]bsent these agreements, independent ATM transacting networks would be able to compete with the Visa and MasterCard networks by offering lower

ATM Access Fees than those charged in the Visa and MasterCard networks." *Id.* ¶ 37.  But plaintiff's speculation depends on a huge number of assumptions – most notably, that ATM operators would realize some savings if they used the other networks – but also that there would be some mechanism whereby they could pass that savings onto consumers by incorporating some sort of consumer network choice into the transaction.  Moreover, the suggestion that the new competing networks would "offer lower fees" than Visa and MasterCard is inconsistent with the allegation in the complaint that it is the ATM operator, not the network, who charges the consumer the access fee in the first place.  *See id.* ¶ 8.[13]  These conclusory statements do not provide sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.[14]

---

[13]    This same confusion is evident in paragraph 45.  Stoumbos alleges that the contract provisions "secure compliance by [Visa and MasterCard's] customers and suppliers."  *Stoumbos* Compl. ¶ 45.  Customers *and* suppliers?  Which is it?  Should it not be apparent by the time one has reached this point in the complaint whether the allegation is that the independent ATM operators are the networks' customers or if they are their suppliers?

[14]    The complaints are also quite fuzzy about what market the consumer plaintiffs think is being restrained by the access fee rules and where the change will be if those rules are eliminated.  At certain points, the complaints seem to indicate that what has been affected is the competition between networks.  *See Mackmin* Compl. ¶ 4 (alleging that access fee rules allow Visa and MasterCard to maintain their market position and restrict competition between card networks).  They suggest that this competition is supposed to occur at the individual machines. *See Stoumbos.* Compl. ¶ 41 ("[T]he ATM restraints suppress competition with rival networks at the point of the transaction, where ATM operators interact directly with consumers.").  But plaintiffs also express concerns about the market for PIN cards.  *See id.* ¶ 47 ("Visa and MasterCard maintain their market power in light of the insurmountable barriers to entry faced by a potential competitor that might seek to achieve comparable consumer acceptance of its PIN-debit card, while at the same time the ATM restraints effectively foreclose competitive ATM networks from competing to carry a larger share of ATM transactions.")  And the plaintiffs alternate between complaining that the networks are not competing with each other, *id.* ¶ 37, and that the ATM *operators* are not competing with each other.  *Id.* ¶ 34.  The schizophrenic nature of plaintiffs' world view comes to a head in the odd allegation in the *Stoumbos* complaint that the ATM operators are "unwilling co-conspirators."  *Id.* ¶ 21.  If the essence of conspiracy is an agreement, then this is something of an oxymoron, and the plaintiffs seem torn between casting the operators as fellow victims or as participants in the scheme.

**B.      The *NAC* Independent ATM Operators' Complaint**

The *NAC* plaintiffs represent independent ATM operators.   *NAC* Compl. ¶¶ 7, 9–22.   As such, they stand between the consumer and the network in a transaction involving an independent ATM.   The *NAC* plaintiffs insist that since they have alleged antitrust injury, they have also alleged Article III injury in fact.   NAC Suppl. Br. at 8 (stating that the *NAC* complaint "reveals allegations of a compensable antitrust injury that more than satisfy the requirements for pleading antitrust injury and, *a fortiori*, Article III injury in fact").   That might be true if the NAC plaintiffs had properly alleged both prongs of antitrust injury – that is, both harm to competition *and* injury in fact – but the second showing is missing.

In opposition to the motion to dismiss on antitrust standing grounds, the *NAC* plaintiffs point to their allegations that the access fee rules "enable both Visa and MasterCard to charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, [] to steer excessive and disproportionate compensation for ATM transactions to their member banks . . . and to establish terms that benefit the defendants and their co-conspirator banks and harm ATM operators."   *Id.*, quoting *NAC* Compl. ¶ 46 (alteration in original) (quotation marks omitted).   They also allege that as a result of the access fee rules, "the ATM Operator Plaintiffs and the putative class have been injured in their business and property in an amount not presently known.   . . . by supracompetative fees that greatly exceed the fees that would be paid by ATM operators for network and bank services in a competitive market."   *Id.*, quoting *NAC* Compl. ¶ 67 (quotation marks omitted).

But none of this sets forth facts that could support an inference that the access fee requirements injure the *plaintiffs* – the ATM operators.   It is the consumers, not the operators, who pay the allegedly inflated ATM access fees.   *NAC* Compl. ¶ 37 ("Consumers pay for ATM

services from banks of which they are not customers and from non-bank ATM operators by paying a surcharge levied at the point of the transaction (an 'access fee'). . . . The access fee is added to the amount withdrawn from the cardholder's account at the time of the transaction . . . .").   Thus, the allegations that the access fee requirements prevent ATM operators from offering consumers a discount to use lower cost networks does not allege harm to the operators themselves.  *See id.* ¶¶ 45, 49.   If ATM operators are required to charge consumers more for ATM transactions than they might absent the access fee rules, the rules tend to benefit operators by increasing their revenue.  This does not constitute antitrust injury.  *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (explaining that conspiracy to charge higher-than-competitive prices for televisions and other electronic products could not injure competing manufacturers of such products because they would stand to gain from a conspiracy to raise prices for the products).

The *NAC* plaintiffs also allege that the access fee requirements enable Visa and MasterCard "to charge artificially high network fees," "remit inadequate compensation to ATM operators," and "steer excessive and disproportionate compensation" to their member banks, to the benefit of the card companies and member banks.  *NAC* Compl. ¶ 46.  But these allegations are highly conclusory and therefore, need not be accepted at face value.  The *NAC* complaint provides no facts suggesting how requirements equalizing access fees that consumers pay plausibly resulted in these alleged harms.[15]  The   complaint   draws   absolutely   no   connection

---

15      Counsel for *NAC* plaintiffs stated in oral argument that the requirements harm operators because the clauses prevent operators from gaining volume by preventing them from offering incentives to consumers to choose lower cost networks for their transactions.  Tr. at 66–67.  But this is not stated in the complaint.  The complaint does not indicate that a consumer has any opportunity to choose which network will carry his transaction, and furthermore, it provides no facts from which one could conclude that there are networks that cost less than others.

between the access fees and funds flowing to the banks.  Nor does it provide any detail about whether and how the ATM operators are supposed to be compensated.

Most important, the *NAC* complaint does not allege that Visa and MasterCard charge "network fees" at all, much less make clear how they have been "artificially" inflated.  There are no allegations that indicate that Visa and MasterCard ask the ATM operators – or anyone else – to pay anything, what the fees might be, how they are calculated, how and when they are paid, or who pays them.  Similarly, the complaint does not include the fact that Visa and MasterCard pay "compensation to ATM operators" at all, much less any facts that would support the inference that it is "inadequate."  At oral argument, counsel for *NAC* plaintiffs explained that the consumer's bank pays an "interchange" fee to the network for processing a transaction, which the network then forwards to the ATM operator after deducting a network fee.  Tr. at 57–58.  But none of this is in the complaint.  The fact that operators receive access fees from consumers and separately receive "interchange" from the issuing bank suggests the two fees are not directly related.  The complaint provides the Court no facts from which the Court can understand or infer how the access fee relates to the interchange fee relates to the network fee, much less how the Visa and MasterCard requirements affect the amount of interchange operators receive.  Accordingly, the *NAC* complaint does not allege injury in fact.

Thus, none of the complaints does anything more than make the "but for" claim.  The complaints do not specify what market is being restrained, how it is supposed to work, how it was adversely affected, and how that circumstance injured the plaintiffs.  A critical problem is that plaintiffs do not make clear who pays whom in these transactions.  They do not explain what the ATM operators' costs might be or how they are tied to the pricing of the fees, and there are

no facts in the complaints that support a conclusion that prices would be lower if the restrictions at issue were lifted.

The complaints allege that the contract provisions prohibit ATM operators from passing on the savings that could be realized when using "lower cost networks," and that consumers are therefore paying "supra-competitive" fees.  But the notion that there *are* other networks that actually can or do charge the ATM operators less – thereby giving rise to savings that could be passed along to the consumer – is not stated anywhere.  Plaintiff Stoumbos comes the closest when she states, "Alternative PIN-debit networks are less costly." *Stoumbos* Compl. ¶ 41.  But neither Stoumbos nor any other plaintiff offers facts to flesh out that characterization.  And the fact that this is a problem at the heart of the case was exposed during oral argument, when counsel explained that in fact, the operators charge the networks and not the other way around. Tr. at 57–58.

As they stood before the Court, defendants pointed out and plaintiffs did not dispute that ATM operators do not incur "costs" for accessing different networks at all.  Rather, issuing banks pay the ATM operators "interchange fees" via the networks, and networks deduct a portion of these interchange fees before passing them on to the ATM operators.  *See* Tr. at 12–13, 54–58.  It is unclear to the Court how businesses that do not incur costs can pass "cost savings" along to someone else.  More important, the fact that the money flows in this direction is not stated clearly in the consumer complaints. *See NAC* Compl. ¶ 46. (alleging that the "ATM restraints . . . enable both Visa and MasterCard to charge artificially high network fees for ATM transactions, to remit inadequate compensation to ATM operators, and to steer excessive and disproportionate compensation for ATM transactions to their member banks").  And it is altogether absent from the operators' complaint.  NAC's counsel justified this omission by

explaining that the term "*lower cost networks*" in all three complaints was meant to refer to alternative *networks that pay the operators higher fees* than those paid by Visa and MasterCard. Tr. at 54.   But nothing in the complaints would alert the reader to the fact that plaintiffs are relying upon this novel and unsustainable definition of the term "cost."

Moreover, at oral argument, plaintiffs advanced a different theory of competitive harm than the one advanced in the pleadings.   The lawsuits assert primarily that the problem is that consumers are being denied the opportunity to choose to use a "lower cost network" at the point of the ATM transaction, that the ATM operators are being denied the opportunity to pass along the savings that would thereby be achieved, and therefore, banks and independent operators get away with charging too much.   So initially, it seemed that this case was about a lack of competition in a market where banks and independent ATM operators compete for individual customers' ATM transactions at individual ATM machines.   *See, e.g.*, *Stoumbos* Compl. ¶ 41 ("[T]he ATM restraints suppress competition with rival networks *at the point of the transaction*, where ATM operators interact directly with consumers.") (emphasis added).   But the ground shifted at oral argument, when plaintiffs acknowledged that by "lower cost networks," they meant networks that pay the ATM operators more; that it is the ATM operators, and not the consumers, who select which network to utilize for a given transaction, Tr. at 54–58; and that the ATM operators *already automatically* route transactions over the "lower cost" networks.   *Id.*   So they posited a different theory instead:   that ATM operators prefer to use the alternative networks that pay them the higher fees; that they can only select those networks for transactions involving PIN cards branded with the alternative service marks; that if they could, the ATM operators would discount the access fees for customers utilizing those PIN cards to increase the volume of those transactions at their ATMs; and that therefore, if the restrictions at issue here were struck

down,  consumers would start to demand that their banks issue cards branded with the alternative marks, and there would be more competition among networks at *that* point in the chain.  Tr. at 76, 82, 97.

Whether that theory holds water or not, it is not alleged in the complaints.  A court can only assess the sufficiency of what is on the face of the complaints and not allegations that have been amplified or supplemented or brought in to pinch hit at oral argument.  In the end, notwithstanding plaintiffs' adamant insistence that consumers are being overcharged, the Court simply could not find facts to support that contention in the complaints. [16]

---

[16]    The case will be dismissed on the grounds that plaintiffs have failed to satisfy the first prong of the antitrust injury:  injury in fact.  But defendants have also challenged the sufficiency of the second prong:  whether the complaint sets out the necessary injury to competition.  They point out that the Visa and MasterCard requirements do not fix prices for ATM services since they do not require operators to charge a specific amount in access fees to consumers.  Visa/MC Mot. at 18.  They also do not bar ATM operators in any way from discounting the ATM access fees they charge to consumers across the board in order to compete with other operators and attract more customers to their terminals.  *Id*.  Further, defendants assert that the access fees requirements are actually procompetitive, and not anticompetitive.  *Id*. at 14–17; Banks' Mot. at 9–13.  The bank defendants note that by virtue of these provisions, consumers using the Visa or MasterCard networks get the benefit of the lowest access fee an ATM operator is willing to charge.  Banks' Mot. at 19–20.  Thus, the banks argue, the access fee requirements benefit the vast majority of consumers, since most PIN cards use the Visa or MasterCard networks.  *See Dial A Car*, 884 F. Supp. at 591 (dismissing antitrust claim, in part, because defendants' conduct resulted in lower prices in the market).  Defendants also argue that the contract provisions are akin to most favored nation clauses, which are not *per se* anticompetitive.  Visa/MC Mot. at 14–19; Banks' Mot. at 9–13.  The Court is skeptical about this analogy since those clauses are designed to ensure that buyers pay the lowest price available.  *See, e.g.*, *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 926 (1st Cir. 1984) (finding Blue Shield to be *like* a buyer because it pays the bill and seeks to set the amount of the charge).  Visa and MasterCard are not analogous to buyers in this situation. Defendants also stress that plaintiffs have not alleged that consumers can even choose at the ATM which payment network will process their transactions.  Visa/MC Mot. at 18; Banks' Mot. at 21.  Because of this, any benefit ATM owners might theoretically provide to consumers without the access fee rules cannot be passed on to consumers – there is no competition at the point of transaction, so there cannot be injury to competition.  *Id.*
        Given the failure of the pleadings on injury in fact, which is necessary for Article III purposes as well as under the Clayton Act, *see Dominguez*, 666 F.3d at 1362, and the flaws in the conspiracy allegations, the court need not reach these questions.  Thus, the order dismissing the cases should not be viewed as a finding by this court that the restrictions are procompetitive or that they are merely most favored nation provisions.

III.    **The Complaints Do Not Allege an Agreement or Conspiracy**

Plaintiffs in all three cases allege a horizontal conspiracy to restrain trade.[17] *NAC* Compl.

¶¶ 31, 43; *Mackmin* Compl. ¶¶ 45–46; *Stoumbos* Compl. ¶¶ 21, 34.[18] Plaintiffs allege that before

March 18, 2008, and May 24, 2006, when Visa and MasterCard respectively made initial public

offerings to become public companies, they were associations owned and operated by a majority

of the retail banks in the United States.  *NAC* Compl. ¶ 30; *Mackmin* Compl. ¶ 44; *Stoumbos*

Compl. ¶ 20.  Visa and MasterCard are no longer associations, but plaintiffs allege that "banks

continue to hold non-equity membership interests" in their subsidiaries and "the largest among

them also hold equity interests and seats on [their] boards of directors."  *NAC* Compl. ¶ 30;

*Mackmin* Compl. ¶ 44; *Stoumbos* Compl. ¶ 21.  The *Mackmin* complaint also contains general

allegations that the named bank defendants have been involved with Visa and MasterCard's

governance:  Bank of America "currently and/or has been" represented on the Visa board of

directors.  *Mackmin* Compl. ¶ 32.  Chase used to have representation on the MasterCard and Visa

boards of directors before each association's IPOs.  *Id.* ¶ 37.  Its representation on the

MasterCard board ended in 2003, and its representation on the Visa board ended in 2006.  *Id.*

Wells Fargo was represented on the companies' boards "[d]uring parts of the relevant time

period."  *Id.* ¶ 42.  *Mackmin* plaintiffs conclude that all of the bank defendants belong to both

networks and have periodically served on the board of directors of each network.  *Id.* ¶ 43.

According to all the plaintiffs, the network defendants still refer to their bank customers as

---

17    Horizontal agreements are agreements among competitors, and vertical agreements are
those among firms at different levels of distribution.  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717, 730 (1988).  Horizontal price fixing agreements are *per se* illegal under the
Sherman Act.  *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607–08 (1972).

18    Because the factual allegations regarding agreement and conspiracy in the three
complaints are substantially similar, the Court addresses the complaints together.

"members" and "operate principally for the benefit of their member banks." *NAC* Compl. ¶ 30; *Mackmin* Compl. ¶ 45; *Stoumbos* Compl. ¶ 21.

Plaintiffs allege that the challenged access fee rules originated in the rules and regulations agreed to by the banks before Visa and MasterCard became public corporations and that these rules create a horizontal conspiracy. *Mackmin* Compl. ¶ 45 ("These restraints originated in the rules of the former bankcard associations agreed to by the banks themselves. By perpetuating this arrangement, the banks collectively have ceded power and authority to the Network Defendants to design, implement, and enforce a horizontal price-fixing restraint . . . ."); *Stoumbos* Compl. ¶ 21 ("The unreasonable restraints of trade in this case are horizontal agreements among Visa, MasterCard and their member banks to adopt, adhere to, and enforce rules . . . that require ATMs to grant most-favored-nation ('MFN') treatment with respect to the ATM Access Fees charged for Visa and MasterCard network transactions."); *NAC* Compl. ¶ 31 ("The unreasonable restraints of trade in this case include horizontal agreements among the issuers of Visa and MasterCard products to adhere to rules and operating regulations that require ATM access fees to be fixed at a certain level."). Plaintiffs' claims of an agreement or conspiracy, thus, rest on the allegation that before Visa and MasterCard became publicly held corporations, their member banks created the associations' rules and regulations containing the access fee rules that remain in place today. None of the complaints allege that the banks agreed among themselves to do anything. Rather, the claim of a horizontal conspiracy arises from the prior existence of the bankcard associations.

Given this, the question before the Court is whether allegations that the access fee rules originated when Visa and MasterCard were managed and operated by their member banks and that today, some banks have or have had in the past some undefined amount of equity and/or

number of board seats on the Visa or MasterCard boards of directors is enough to allege a current agreement or conspiracy to restrain trade under the Sherman Act.  In other words, is the allegation that the access fee rules originated with the bankcard associations and that the rules still exist enough to allege a current agreement among banks to restrain trade?

Visa and MasterCard argue that plaintiffs cannot assert a conspiracy simply based on the allegation that banks are members of Visa or MasterCard and follow the networks' rules. Visa/MC Mot. at 9–11.  They further argue that the fact that bank employees have, at times, served on the boards of Visa or MasterCard or that banks have held unspecified equity interests in Visa or MasterCard does not establish a conspiracy to restrain trade.  *Id.* at 11–12.  Finally, they argue plaintiffs allege no basis for conspiracy under *American Needle.  Id.* at 12–14. Similarly, the bank defendants assert that plaintiffs have not pled facts to support an inference of a horizontal agreement because they do not allege that the bank defendants agreed among themselves to adhere to the networks' access fee rules.  Banks' Mot. at 13.

Plaintiffs' allegations that banks used to belong to the bankcard associations does not provide factual support for the conclusion that banks are engaged in a horizontal conspiracy to restrain trade.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (holding that belonging to an association or being on a board of directors of a network does not establish a horizontal agreement).[19]  As in the cases before the Court, the complaint in *Kendall* depended upon allegations describing the Visa and MasterCard bankcard associations, or consortiums, as they were called in *Kendall.  Id.* at 1045.  There, plaintiffs alleged that banks participated in the management of and had proprietary interests in the consortiums, that they charged plaintiffs an interchange rate fixed by the consortiums, and that they adopted the fees set by the consortiums.

---

19      Contrary to argument from NAC counsel that this case was dismissed for a failure of proof, Tr. at 89, the court there granted a motion to dismiss.  *Kendall,* 518 F.3d at 1045.

*Id.* at 1048.   Based on these allegations, plaintiffs there claimed the banks engaged in a conspiracy to restrain trade.   The Ninth Circuit disagreed and ruled that plaintiffs did not allege sufficient facts to support their theory, holding that allegations about the existence of the association alone are not enough to establish an agreement.   "[M]embership in an association does not render an association's members automatically liable for antitrust violations committed by the association.   Even participation on the association's board of directors is not enough by itself."   *Id.* (citation omitted).

Plaintiffs here argue that they have alleged much more than what was asserted in *Kendall*, Tr. at 127, but they have not.   Indeed, they allege less.   In *Kendall*, the bankcard associations were still in existence and the banks still belonged to the associations.   *See Kendall*, 518 F.3d at 1048.   Here, plaintiffs can only allege that banks *previously* belonged to the associations, and membership in an association – much less membership in a defunct association – is not enough to establish agreement or conspiracy.

Plaintiffs' allegations that banks today have some equity interest in and hold some seats on the boards of Visa and MasterCard also do not provide factual support for the conclusion that banks are engaged in a horizontal conspiracy to restrain trade.   Vague allegations that banks "hold non-equity membership interests" in Visa and MasterCard subsidiaries and "the largest among them also hold equity interests and seats on [their] boards of directors" does not show that banks control Visa and MasterCard.   Even the *Mackmin* complaint, which attempts to set forth allegations about the continuing role of the named defendant banks in Visa and MasterCard, can only muster generalized claims.   *See Mackmin* Compl. ¶¶ 32, 37, 42 (stating that Bank of America "currently and/or has been" represented on the Visa board of directors, Chase had representation on the MasterCard and Visa boards before their IPOs, and Wells Fargo was

represented on the companies' boards "[d]uring parts of the relevant time period"). These general allegations are not enough to support the theory that banks control Visa and MasterCard today such that the card companies are simply a vehicle by which the banks exercise a horizontal agreement. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008) (granting motion to dismiss in part because plaintiffs failed to allege facts demonstrating that banks continued to control MasterCard after its IPO). And the allegation that these publicly held companies are operating for the benefit of the banks instead of their shareholders is if no assistance: that allegation is conclusory, with no facts alleged to support this claim. Thus, there are no factual allegations that allow the Court to conclude that any control that banks may have once exercised over Visa and MasterCard when they were associations continues today.

Furthermore, the complaints allege no facts to suggest the existence of either an actual or a tacit agreement among banks to restrain trade by individually agreeing to the Visa and MasterCard agreements. At most, plaintiffs allege that ATM operators – both banks and independent operators – make independent business decisions whether to participate in the Visa and MasterCard networks. A statement of parallel conduct alone, without factual allegations to plausibly suggest an illegal agreement, is not enough. *Twombly*, 550 U.S. at 567–70 (dismissing antitrust complaint because allegations of parallel conduct without more did not plausibly suggest an unlawful agreement).

Plaintiffs attempt to compare their cases to *Starr v. Sony BMG Music Entertainment,* 592 F.3d 314 (2d Cir. 2010). *Starr* involved a claim that sellers of digital music had conspired to fix the price of digital music. *Id.* at 317. The court denied a motion to dismiss on the basis that plaintiffs' allegations of parallel conduct were sufficient to state a Section 1 Sherman Act claim.

*Id.*  The court reached that conclusion, in part, because the *Starr* complaint included *factual* allegations that suggested a preceding agreement among defendants, which could not be explained absent an unlawful agreement.  *Id.* at 323.  First, plaintiffs alleged that defendants controlled more than 80% of the digital music sales in the U.S. market.  *Id.*  Second, they alleged facts indicating that two companies that defendants created to distribute digital music, MusicNet and pressplay, would have been unprofitable absent an unlawful agreement.  *Id.* at 324.  Third, they pointed to statements by one defendant's CEO that supported the existence of an unlawful agreement.  *Id.* (referencing a quote from the CEO of a defendant company, who suggested that "pressplay was formed expressly as an effort to stop the 'continuing devaluation of music'").  The *Starr* court concluded that these facts taken together suggested a preceding agreement and not merely parallel conduct that could just as well have been independent action.  *Id.* at 323.

Plaintiffs also cite *Interstate Circuit v. United States*, 306 U.S. 208 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), for the proposition that the existence of a horizontal conspiracy can be inferred from the series of similar vertical arrangements between Visa or MasterCard and different banks – a so-called "hub and spoke" conspiracy.  Tr. at 126. *Interstate Circuit* involved a conspiracy among distributors and exhibitors of movies, and *Toys "R" Us* involved a conspiracy between toy retailer Toys "R" Us and toy manufacturers.   In *Interstate Circuit*, the court found evidence of a horizontal conspiracy when movie exhibitor Interstate, which had a monopoly on first run movies in Texas, sent an identical letter to eight movie distributors naming all eight distributors as addressees, asking them to agree to a minimum price for first-run theaters and a policy against double features at night.  *Interstate Circuit*, 306 U.S. at 215–217.  The trial court drew an inference of agreement from the nature of the proposals, the manner in which they were made, the substantial unanimity of action taken,

and the lack of evidence of a benign motive. *Id.* at 221. The Supreme Court affirmed. *Id.* The Court viewed as important the fact that the new distribution policies represented a radical shift from the industry's prior business practices and rejected arguments that such unanimity of action was explainable by chance. *Id.* at 222.

*Toys "R" Us* involved a series of vertical agreements between the toy retailer and toy manufacturers to restrict distribution of products to lower priced warehouse club stores. *Toys "R" Us*, 221 F.3d at 931–32. The Seventh Circuit upheld the Federal Trade Commission's finding of a horizontal conspiracy based on the series of vertical agreements in which toy manufacturers boycotted sales to warehouse stores. *Id.* at 935. In doing so, the FTC – which the Seventh Circuit affirmed – emphasized that the boycott was against the manufacturers' own interest and depended on all the manufacturers participating. *Id.* at 932.

It is true that an agreement can be shown by either direct or circumstantial evidence. *Id.* at 934. But when the agreement is purely circumstantial, there must be some evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Id.* What facts are alleged in the complaints before this Court that *exclude* that possibility? Why would it not be in each bank's independent self-interest to adopt the rules proffered by Visa or MasterCard to be able to handle the vast majority of ATM transactions? Even if Visa or MasterCard were pressuring them to do something that is ultimately anticompetitive and not in the consumers' interest, what alleged facts suggest that any individual bank would only want to do it as long as other banks did it? These complaints do not have the additional facts that were important in both *Interstate* and *Toys "R" Us*: the restraints here are not a sudden break from past practice that would be inexplicable without the agreement, as in *Interstate*, and they are not contrary to the

banks' own interests or dependent on all banks participating, like the sales boycott executed by manufacturers in *Toys "R" Us.*

Finally, plaintiffs' allegations that the banks ceded control and authority to the networks does not establish a conspiracy under *American Needle, Inc. v. National Football League,* 130 S. Ct. 2201, 560 US __, 176 L. Ed. 2d 947 (2010).   That case involved the question of whether the defendant, the National Football League Properties ("NFLP"), was a single entity or whether it was a group of individual entities acting in concert.   This is important because Section 1 of the Sherman Act requires an allegation of concerted action that restrains trade.   15 U.S.C. § 1. Section 2 of the Sherman Act covers independent action and concerted action, but it requires a showing of monopolization, not just a restraint of trade.   15 U.S.C. § 2.[20]   The *American Needle* court had "only a narrow issue to decide:   whether the NFL respondents are *capable* of engaging in a 'contract, combination . . . , or conspiracy.'"   *American Needle,* 130 S. Ct. at 2208 (emphasis added).   In other words, was there an agreement?   Was the unincorporated association of football teams just one entity, or was it appropriate for the court to consider them to be more than one entity capable of combining and violating Section 1?

In providing some background for the issue it had to decide, the Supreme Court explained why Section 1 of the Sherman Act has a lower threshold for liability than Section 2. The Court stated that concerted action is more fraught with anticompetitive risk than independent action, and therefore, concerted action is treated more strictly under the Sherman Act than independent action – *because* it deprives the marketplace of the independent centers of decision making that are fundamental to competition.   *Id.* at 2209.   But the Court did not hold that anytime there is a diminution in independent decision making, that automatically means an

---

20      Plaintiffs in all three cases before the Court allege violations of only Section 1 of the Sherman Act.

antitrust conspiracy exists.  And it did not purport to, nor did it, articulate any substitute for the requirement of an agreement or combination.  In deciding the question before it, the Supreme Court simply recognized that the legal structure of the venture was not determinative, and that the key issue on the question of whether the defendant was a single or collective entity was whether the organization joined together independent centers of decision making.  Thus, *American Needle* did not create a new test for the sufficiency of conspiracy allegations.

Here, there is no question that Visa, MasterCard, and the banks are separate entities. Visa and MasterCard are each public corporations, and the bankcard associations, which were once controlled by the banks, no longer exist.  Further, there is no allegation that the independent banks are currently joined together in a collective entity for decision-making purposes.  Thus, *American Needle* is inapposite and of limited assistance in these cases.

In sum, the plaintiffs fail to allege sufficient factual allegations to support a claim that defendants have entered into an agreement or conspiracy to restrain trade.

## CONCLUSION

For the reasons explained above, the Court finds that the complaints do not allege injury in fact or the existence of an agreement or conspiracy and therefore, it will grant defendants' motions to dismiss without prejudice.  The Court has not concluded that plaintiffs could never make factual allegations to support their claims; it simply rules that plaintiffs have not done so here.  Given that the federal claims are insufficient, the Court declines to consider plaintiffs' state law claims.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 13, 2013