# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )     CA No. 1:11-cv-01803 (ABJ) |
| | ) |
| VISA INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____

| | |
|---|---|
| ANDREW MACKMIN, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     CA No. 1:11-cv-01831 (ABJ) |
| | ) |
| VISA INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____

| | |
|---|---|
| MARY STOUMBOS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     CA No. 1:11-cv-01882 (ABJ) |
| | ) |
| | ) |
| VISA INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____

## <u>MEMORANDUM OPINION</u>

Before the Court are motions to amend the complaints in three separate antitrust lawsuits.

Plaintiffs in all three cases allege that certain pricing requirements that defendants Visa and

MasterCard impose on operators of automatic teller machines ("ATMs") violate section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* (2012).  On February 13, 2013, the Court dismissed

the lawsuits without prejudice for failing to plead sufficient facts to allege either injury in fact or

the existence of an agreement or conspiracy. *Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp.

2d 73 (D.D.C. 2013).   Shortly after, plaintiffs filed motions to alter or amend the Court's

judgment under Federal Rule of Civil Procedure 59(e), asking the Court to amend the judgment

to dismiss the complaints, but not the cases, so plaintiffs could then move to amend their

complaints.[1]   While these motions were pending, plaintiffs filed motions for leave to amend their

complaints under Federal Rule of Civil Procedure 15(a).[2]

Plaintiffs attempt to remedy the pleading deficiencies in their first amended complaints

by setting forth new factual allegations in their proposed second amended complaints.   The

allegations of injury in the new complaints are still highly conclusory, and since they depend

upon a series of intervening actions by parties not before the Court, they fail to state a

redressable injury in fact.   And even if the consumer plaintiffs have overcome the standing

---

1       *See* Pls.' Mot. to Alter or Amend the Ct.'s Feb. 13 Order Pursuant to Fed. R. Civ. P. 59(e), *NAC* [Dkt. # 36], *Mackimin* [Dkt. # 59], *Stoumbos* [Dkt. # 29].  Visa, MasterCard, and the bank defendants filed a single joint memorandum in opposition to plaintiffs' motions to alter or amend.  *See* Mem. P. & A. in Opp. to Pls.' Mot. to Alter or Amend this Ct.'s Feb. 13 Order Pursuant to Fed. R. Civ. P. 59(e), *NAC* [Dkt. # 37], *Mackmin* [Dkt. # 60], *Stoumbos* [Dkt. # 30].

2       *See* Mot. of Pls. National ATM Council Inc. for Leave to File 2d Am. Class Action Compl. [Dkt. # 39] ("NAC Mot. to Amend"); Mot. of Mackmin Pls. for Leave to File 2d Am. Class Action Compl. [Dkt. # 65] ("Mackmin Mot. to Amend"); and Pl.'s Mot. for Leave to File 2d Am. Compl. [Dkt. # 32] ("Stoumbos Mot. to Amend").

Visa and MasterCard filed a single joint opposition to the motions to amend.  *See* Visa and MasterCard Defs.' Mem. P. & A. in Opp. to Pls.' Mot.s for Leave to Amend, *NAC* [Dkt. # 42], *Mackimin* [Dkt. # 69], *Stoumbos* [Dkt. # 34] (collectively, "Visa/MC Opp.")  The bank defendants filed a joint memorandum in opposition for leave to amend in *Mackimin*.  *See* Bank Defs.' Mem. in Opp. to Pls.' Mot. for Leave to File 2d Am. Class Action Compl. [Dkt. # 68] ("Banks' Opp.").

Each set of plaintiffs filed separate reply briefs.  *See* Reply Mem. of P. & A. of Pl. ATM Operators to Bankcard Ass'n Defs.' Opp. to Pls.' Mot. for Leave to Amend [Dkt. # 44] ("NAC Reply"); Pls.' Reply Mem. in Further Supp. of Their Mot. for Leave to File an Am. Compl. [Dkt. # 70] ("Mackmin Reply"); Pls.' Reply in Further Supp. of Mot. for Leave to Amend [Dkt. # 35] ("Stoumbos Reply").

hurdle, they have yet to allege facts to support the conspiracy allegations. Accordingly, the Court will deny the motions to amend because the amendments in all three cases would be futile. The Court will also deny the motions to alter the judgment as moot.

## BACKGROUND

All three proposed second amended complaints set forth additional allegations about ATM transactions, including additional facts about the role of the entities involved in these transactions and the fees they pay, and they add detail to support plaintiffs' theory of injury.

As the new complaints recount, consumers use personal identification number ("PIN") cards issued by their banks to access ATMs at locations other than a bank branch. When a consumer uses an ATM, the transaction request is transmitted electronically from the ATM to the bank that acquires the transaction, called the "acquiring bank." 2d Am. Class Action Compl., Ex. A to NAC Mot. to Amend [Dkt. # 39-2] ("NAC Proposed Compl.") ¶¶ 40, 45; 2d Am. Class Action Compl., Ex. A to Mackmin Mot. to Amend ("Mackmin Proposed Compl.") [Dkt. # 65-2] ¶ 58. The acquiring bank then sends the request electronically to the "issuing bank," which is the bank that issued the ATM card to the consumer and maintains the account from which the consumer seeks to withdraw money. NAC Proposed Compl. ¶ 45; *see* Mackmin Proposed Compl. ¶ 61. If the issuing bank confirms that the consumer has sufficient funds for the withdrawal, it sends an authorization back to the ATM operator, and the ATM dispenses the cash to the consumer. NAC Proposed Compl. ¶ 54.

ATM networks, such as Visa, MasterCard, Star, NYCE, Star, Pulse, or others, provide the infrastructure through which the data in an ATM transaction is transmitted electronically

from the ATM to the acquiring bank, to the issuing bank, and back.[3]   Some ATMs are bank-owned, while others are owned and operated by independent entities.   *Id.* ¶ 54; Mackmin Proposed Compl. ¶ 69; 2d Am. Class Action Compl., Attach. A to Stoumbos Mot. to Amend [Dkt. # 32-3] ("Stoumbos Proposed Compl.") ¶ 5.   In order to transmit a transaction through an ATM network, the ATM operator must have a contract with that network.   Banks that issue Visa- or MasterCard-branded PIN cards are automatically granted access to the Visa or MasterCard networks.   Non-bank, independent operators obtain access to Visa, MasterCard, and other ATM networks by affiliating with a sponsoring financial institution, which acts as the acquiring bank for the independent operator.   NAC Proposed Compl. ¶ 48; Mackmin Proposed Compl. ¶ 69; Stoumbos Proposed Compl. ¶¶ 55, 76.   Sponsoring financial institutions ensure that the independent operator is properly registered with a network provider and follows the network's agreements.   NAC Proposed Compl. ¶ 48; Mackmin Proposed Compl. ¶ 69; Stoumbos Proposed Compl. ¶¶ 76–77.

The designation of which network is used to process an ATM transaction depends not only on the networks the ATM can access, but also on the network or networks the consumer's PIN card is authorized to use, which are ordinarily identified by network logos, or "bugs," on the reverse side of the card.   NAC Proposed Compl. ¶ 52; Mackmin Proposed Compl. ¶¶ 58–59; *see* Stoumbos Proposed Compl. ¶ 69.   So, for example, if a consumer's PIN card carries only the Visa bug, an ATM transaction can only be sent through the Visa network, but if it carries

---

3      It is not clear from the complaints whether a network, such as Visa, MasterCard, or NYCE, is used to transmit a transaction between an ATM and an acquiring bank when the acquiring bank owns the ATM.   *See* NAC Proposed Compl. ¶ 46.   For example, if a consumer uses a Bank of America PIN card at an ATM owned and operated by Wells Fargo, it is not clear if the transmission between Wells Fargo's ATM and Wells Fargo as the acquiring bank occurs through a network or through an internal Wells Fargo system.

multiple bugs, such as Visa, STAR, NYCE, and Pulse, the transaction can be sent through any of those networks that the ATM can access.

When a customer uses an ATM that is not owned by his bank – whether it is owned by another bank or by an independent operator – the transaction is called a "foreign ATM transaction."[4]   NAC Proposed Compl. ¶ 46; Mackmin Proposed Compl. ¶ 60; *see* Stoumbos Proposed Compl. at 20 n.2.  The consumer in this type of transaction may be subject to two fees: (1) foreign ATM fees and (2) surcharge or access fees.  NAC Proposed Compl. ¶¶ 53, 55, 57, 60; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. ¶¶ 61, 72.  The foreign ATM fee is a fee the consumer's own bank may charge its customer for using another entity's ATM.  NAC Proposed Compl. ¶ 55; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. at 20 n.2.  These fees are not at issue in these cases.

The access fee is the fee a consumer pays to the ATM operator for using its ATM.  NAC Proposed Compl. ¶ 53; Mackmin Proposed Compl. ¶ 63; Stoumbos Proposed Compl. ¶ 61.  The consumer has the option of accepting or declining the fee at the point of the transaction:  if the consumer accepts the fee, the transaction proceeds, and if not, the consumer's card is returned and the transaction ends.  NAC Proposed Compl. ¶ 53.  These are the fees at issue in these cases – or, more specifically, rules imposed by Visa and MasterCard on ATM operators governing these fees are at issue in these cases.

Visa and MasterCard each require ATM operators to agree that they will not charge consumers higher access fees for transactions processed over the Visa and MasterCard networks than for transactions processed over other networks.  NAC Proposed Compl. ¶¶ 63–71; Mackmin

---

4       When a customer uses an ATM operated by his own bank, the acquiring bank and issuing bank are the same.  These transactions are called "on us" transactions, NAC Proposed Compl. ¶ 46, and are not at issue in these cases.

Proposed Compl. ¶¶ 77–78; Stoumbos Proposed Compl. ¶¶ 78–79.   These access fee rules prevent ATM operators from offering consumers differentiated access fees based on the networks used for the transactions.

To understand plaintiffs' claims that the rules harm competition, it is necessary to delve more deeply into the financial relationships underlying an ATM transaction.   In the complaints that were dismissed, plaintiffs' allegations centered around the claim that consumers were harmed by the rules because they prevented ATM operators from passing to consumers the savings obtained through the use of "low cost" networks.   But as the Court's opinion explains, plaintiffs failed to allege facts to support this conclusion since they did not allege that other networks cost less to use than the Visa and MasterCard networks.   *See Nat'l ATM Council*, 922 F. Supp. 2d 73.   Indeed, at oral argument, it was revealed that it is the networks that pay the ATM operators, and not the other way around.   So the new complaints advance a more nuanced theory based upon these financial realities, and they explain that what plaintiffs previously meant by "low cost" networks are the alternative networks that enable the ATM operators to realize higher returns.

Independent operators can earn revenue on an ATM transaction from two sources: through the consumer-paid access fees described above, and through "interchange" fees paid to the networks by the banks and then shared with the operators by the networks.   NAC Proposed Compl. ¶ 60; Mackmin Proposed Compl. ¶¶ 63, 66, 91; Stoumbos Proposed Compl. ¶¶ 71–72.

Networks charge interchange to the consumer's issuing bank.   NAC Proposed Compl. ¶¶ 58, 60.   As the association of ATM operators explains:

> The interchange fee originally served to compensate foreign banks for granting an issuing bank's customer access to the foreign bank's ATM services.   After the advent of nonbank ATM operators, however, interchange became an important source of income for ISOs [Independent Sales Organizations] and allows ISOs [to] keep access fees low while still making a profit.  Each ATM network sets its own ATM interchange rate to issuing banks, ranging from zero to as much as $0.60 per transaction.

*Id*. ¶ 56.  According to the ATM operator plaintiffs, ATM operators are not paid interchange directly.  *Id.* ¶ 55.  Rather, networks determine the amount of interchange they will charge to the issuing bank, and then the networks pass some portion of the interchange from the issuing bank to the ATM operator.[5]  *Id*. ¶ 58.

The amount of the interchange received by the ATM operator can be affected by another fee:  the network service fee, which is called the "acquiring fee" when the ATM operator pays it to the network, and referred to as the "switch fee" when the issuing bank pays it to the network.  *See id*. ¶¶ 57–58; Mackmin Proposed Compl. ¶¶ 63–64.  Some networks, including Visa and MasterCard, deduct a portion of the interchange fee paid by the issuing bank before it is passed to the ATM operator, and the share they keep is called the network service fee.  *See* NAC Proposed Compl. ¶ 58; Stoumbos Proposed Compl. ¶ 14; *see also* Mackmin Proposed Compl. ¶¶ 91, 93.  Other networks do not deduct anything from the interchange fee, so the full amount of interchange goes to the ATM operator.

The amount of interchange the ATM operator receives from the issuing bank after any deduction for the network service fee is called "net interchange."  NAC Proposed Compl. ¶ 58; Stoumbos Proposed Compl. ¶ 71.  The net interchange received from the banks and the access

---

5       It is unclear from the complaints why the networks determine the level of interchange the issuing bank must pay if the purpose of interchange is to compensate ATM operators for granting an issuing bank's customer access to their ATMs.

fee paid by the consumer are the two components of an ATM operator's revenue on an ATM transaction.

Visa and MasterCard charge the highest network service fees of all the networks. So the amount of net interchange, and thus the overall revenue that ATM operators receive for transactions processed on the Visa and MasterCard networks, is lower than what they receive for transactions processed on other networks. NAC Proposed Compl. ¶ 59; Mackmin Proposed Compl. ¶ 93; *see also* Stoumbos Proposed Compl. ¶ 45. In other words, it is more profitable for ATM operators to use the alternative networks, which plaintiffs refer to as "less costly" in their complaints. International transactions through the Visa and MasterCard networks can bear a negative interchange, leaving ATM operators to subsidize these transactions with interchange from other transactions. NAC Proposed Compl. ¶ 59; Mackmin Proposed Compl. ¶ 92.

Under the terms of the challenged rules, ATM operators may not charge consumers access fees for Visa or MasterCard transactions that are higher than the access fees charged for transactions using other networks. Plaintiffs allege that this means the operators cannot "steer" consumers to use the "less costly" networks that take a smaller bite out of the interchange and leave the operator with higher revenue. Plaintiffs contend that the access fee rules result in inflated access fees for consumers because ATM operators must set the fees to cover the costs – or reduced revenue – of transactions on the Visa and MasterCard networks. They also complain that the rules prevent ATM operators from offering lower fees to consumers who use networks with lower network fees and higher net interchange. They claim that the rules reduce competition in the network services market because the rules prevent consumers from being able to discern a price difference among network providers and demand a lower price for ATM services.

## STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 15(a)(2), the Court should "freely give leave [to amend] when justice so requires."  But the decision to grant leave to file an amended complaint is not automatic.  The Court may assess the proposed new pleading to determine whether the amendment would be futile.  *Foman v. Davis*, 371 U.S. 178, 181–82 (1962).  And a court does not abuse its discretion if it denies leave to amend or supplement based on futility. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (agreeing with the district court that an amendment was futile when the facts alleged in the complaint "establish[ed] beyond doubt that the Government did not violate [plaintiff's] due process rights"); *Ruffalo v. Oppenheimer & Co.,* 987 F.2d 129, 132 (2d Cir. 1993) (holding that leave to amend was properly denied on futility grounds since new pleading failed to allege any additional significant facts); *Ross v. DynCorp*, 362 F. Supp. 2d  344, 364 n.11 (D.D.C. 2005) ("While a court is instructed by the Federal Rules of Civil Procedure to grant leave to amend a complaint 'freely,' it need not do so where the only result would be to waste time and judicial resources.  Such is the case where the Court determines, in advance, that the claim that a plaintiff plans to add to his or her complaint must fail, as a matter of law . . . ."); *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002) ("A court may deny a motion to amend the complaint as futile when the proposed complaint would not survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss."); *see also* 3 Moore's Federal Practice § 15.15[3] (Matthew Bender 3d ed.) ("An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.").

## ANALYSIS

### I.   THE PROPOSED AMENDED COMPLAINTS DO NOT ALLEGE AN INJURY IN FACT OR INJURY THAT IS REDRESSABLE BY THE COURTS

As the Court previously held, every plaintiff in federal court bears the burden of establishing the three elements that make up Article III standing:  injury in fact, causation, and redressability.  *Nat'l ATM Council¸* 922 F. Supp. 2d at 80 n.9, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Court dismissed plaintiffs' first amended complaints, in part, for failing to allege injury in fact, because they did not allege facts to support a claim of injury that was concrete and particularized and actual or imminent, rather than speculative or generalized.  *Id.*  Plaintiffs attempt to remedy this deficiency by providing additional facts about how the access fee rules affect their businesses and pocketbooks.  Although the new complaints do more clearly elucidate both the financial relationships at issue and plaintiffs' theory of the case, the claims are still too conclusory and too dependent on a number of intervening actions by a series of third parties to state an injury in fact.  The Court also finds that the details set out in the new complaints indicate that plaintiffs' alleged harms would not be redressable, even if the Court were to provide them the relief they seek.

### A.   The NAC Proposed Amended Complaint

Plaintiffs in the *NAC* case are an association of independent ATM operators and thirteen individual independent ATM operators.  NAC Proposed Compl. ¶ 6.  The Court held that the NAC first amended complaint failed to allege the necessary injury in fact because it did not set forth "facts that could support an inference that the access fee requirements injure the *plaintiffs* – the ATM operators." *Nat'l ATM Council, Inc.*, 922 F. Supp. 2d at 88.  In their revised complaint, NAC plaintiffs have now made it clear that their real concerns are based upon the network service fees that Visa and MasterCard deduct from the interchange – not the access fees or the

access fee rules.  This is one reason why their challenge to the access fee rules under the antitrust laws ultimately fails.

ATM operators have no control over the interchange that networks charge to issuing banks or the amount of service fees the networks deduct from the interchange as a charge to the ATM operators.  NAC Proposed Compl. ¶ 58.   Rather, they must take what they get as net interchange. Visa and MasterCard take a higher deduction, and in the case of international transactions over Visa and MasterCard networks, the net interchange can be a negative amount. *Id.* ¶ 59.   The Visa and MasterCard access rules at issue here prohibit the ATM operators from charging more to customers who use those networks, so ATM operators must set one access fee for each ATM terminal, "which serves as its retail price for all ATM transactions at that terminal." *Id.* ¶ 79.  The upshot of this arrangement, then, is that independent ATM operators reap lower profits on Visa and MasterCard transactions, and they must partially subsidize Visa and MasterCard international transactions with interchange revenue from other networks.  *Id.* But for the access rules, NAC plaintiffs assert, ATM operators would be able to make up for the revenue shortfall by charging higher access fees for transactions using the Visa and MasterCard networks, charging less for transactions over other networks, and steering consumers to use other networks that generate more revenue for them.  *Id.* ¶ 82.  This, they assert, would lead to more competition in the network services market.  *Id.* ¶ 83.

Assuming that all of these facts are true, the NAC second amended complaint still does not show that the ATM access rules injure the ATM operators.  First of all, ATM operators already route transactions through whatever network is available that pays them the highest net interchange.  As the operators themselves state: "When an ATM has access to multiple networks that match the bug(s) on the customer's card, the ATM operator's processor can choose which

network over which to route the transaction and customarily routes the transaction through the 'least costly' network, that is, the network that deducts the lowest network services fee and remits the greatest net interchange." *Id.* ¶ 41. So even if consumers lack a choice at the point of the transaction, the operators have the means already in place to maximize their profits.

Second, the second amended complaint makes plain that what really bothers the ATM operators is the service fee – the fact that Visa and MasterCard deduct a higher portion of the interchange than other networks do, leaving the operators to make less money on Visa and MasterCard transactions. As paragraph 82 of their complaint indicates, what it appears that they would like to do, then, is *raise* the access fee they charge to Visa and MasterCard customers, not lower the fees charged for other networks: "But for the ATM Restraints, ATM ISOs would charge different access fees depending on the level of network services fees deducted by the different networks and the cost of carrying those networks international transactions." *Id.* ¶82. So this does not suggest that the operators are the victims of an antitrust conspiracy.

Third, the challenged rules do not prevent operators from increasing access fees across the board to cover any revenue shortfall associated with the use of the Visa and MasterCard networks. Plaintiffs contend that Visa and MasterCard are the primary global brands, and ATM operators must accept their branded cards to remain viable, but if the operators can pass the economic impact of higher network fees on to customers, it is difficult for the Court to discern how the access fee rules cause them any harm.

NAC plaintiffs contend they are nonetheless harmed because they "prefer networks that pay a higher net interchange, as this gives them the best price for their ATM services and allows them to charge a lower access fee to maximize the quantity of ATM services demanded." *Id.* ¶ 61. They attempt to liken the access fee rules to "anti-steering" rules, such as merchant

restraints that have been condemned by the Department of Justice.  According to plaintiffs, at one time, Visa and MasterCard imposed rules on merchants, which are now the subject of a consent decree, that prevented merchants from providing "discounts or non-price benefits, to encourage customers to use the brands of General Purpose Cards that impose lower costs on the merchants."  *Id.* ¶ 85; *see also id.* ¶¶ 86–88.[6]  But the objectionable merchant rules differ from the access rules challenged here because consumers are able to choose among the credit cards in their wallets when offered a discount or other incentive to use a particular credit card at the point of a transaction.  In other words, those consumers can actually be "steered."  But in an ATM transaction, consumers do not have any opportunity to choose which network will be used to process their transactions.  The network is determined by which bugs appear on the PIN cards issued by the customers' banks and which networks are available at – and then selected by – any given ATM.

Given these facts, the NAC plaintiffs articulate their anti-steering theory of injury as follows: in the absence of the access fee rules, ATM operators would offer consumers differentiated access fees at the point of transaction, consumers would then demand multi-bug PIN cards from their banks, their banks would provide these cards, and the market for network services would become more competitive, all resulting in more choice of networks and lower access fees for consumers.

Again, this scenario is focused on relieving an alleged burden on consumers and not the ATM operators.  But in any event, if this is plaintiffs' theory of harm, it is too speculative.  As the Court noted previously, injury in fact requires a plaintiff to allege an injury that is both

---

6       The NAC proposed complaint does not identify the case or the source of the quoted statement.  *See id.* ¶¶ 85–88.

concrete and particularized and actual or imminent, rather than speculative or generalized.  *Nat'l ATM Council*, 922 F. Supp. 2d at 80 n.9, citing *Lujan*, 504 U.S. at 560.

The Court agrees with defendants that this alleged injury is based on an attenuated, speculative chain of events, that relies on numerous independent actors, including the PIN card issuing banks.  Visa/MC Opp. at 10; *see also* Bank's Opp. at 4.  "Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).  There is no guarantee that independent ATM operators would reduce access fees for alternative networks rather than raising access fees for Visa and MasterCard networks.  It is not clear that consumers troubled by access fees would rise up and demand multi-branded cards from their banks when they can already avoid access fees all together by using their own bank ATMs in the first place.  And it is not clear whether the banks would have any incentive to offer PIN cards that are different than those they are issuing now.  Accordingly, the Court holds that the new NAC complaint does not present a particularized, but rather a speculative and generalized, claim of injury, and the operator plaintiffs lack standing.

For similar reasons, the ATM operators' claims pose issues of redressability.  The more independent factors in a chain of causation, the more unlikely it will be that the Court can address the alleged harm even if it were to grant plaintiffs the relief they request.  *See Lujan*, 540 U.S. at 560–61 (holding that plaintiff's injury must be fairly traceable to the challenged action of the defendant and not the result of some third party not before the court); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 496 n.10 (1982) (Brennan, J., dissenting) (explaining that, in cases in which standing was denied, "the

difficulty was that an intermediate link in the causal chain – a third party beyond the control of the court – might serve to bar effective relief.  Even if the court acceded to plaintiffs' view of the law, the court's decree might prove ineffectual to relieve plaintiffs' injury because of the independent action of some third party").  Here, plaintiffs ask the Court to eliminate Visa's and MasterCard's access fee rules.  But for the operator plaintiffs to obtain what they seek – an increased volume of consumer transactions on alternative networks at their terminals, resulting in either added pressure on Visa and MasterCard to reduce their network fees or sufficient additional profits to enable the operators to more easily absorb those fees – multiple independent actors must take multiple independent steps.  Given that effective relief for operators depends, in part, on the actions of these independent actors, the Court finds that their claim is not redressable and, accordingly, they lack standing for that reason as well.

   **B.**  **The Two Consumer Complaints**

   In dismissing the Mackmin first amended complaint, the Court held that the plaintiffs did not allege an injury in fact because they did not "articulate how these restrictions affected them in particular."  *Nat'l ATM Council*, 922 F. Supp. 2d at 85.  They did not allege that the named plaintiffs conducted transactions at an ATM where an alternative network was available, that they had PIN cards that could be used on alternative networks, or that the ATMs they used could access these alternative networks.  *Id.* at 85–86.   In dismissing the Stoumbos first amended complaint, the Court held that it failed to allege that named plaintiff Mary Stoumbos had a PIN card that allowed transactions to be processed over alternative networks or that she used it on an ATM connected to any alternative networks.  *See id*. at 86.

The consumers' proposed second amended complaints plead additional facts with respect to these issues,[7] but like the NAC plaintiffs, they do not allege that consumers have the ability to choose which network will be used to transmit their transactions at the point of the transaction. *See* Mackmin Proposed Compl. ¶ 59 (alleging that the ATM operator, not the consumer, chooses the network to use for each transaction); Stoumbos Proposed Compl. ¶ 85 (alleging only that current technology would allow for ATMs to be reprogrammed in the future to allow this). Thus, they could not have suffered an actual, current injury because, even if the alternative networks had lower access fees, they could not have selected one of those networks to handle their transaction.[8]

More importantly, their theory of antitrust injury is the same as the NAC plaintiffs': that the access fee rules prevent competition in the ATM network market and that their elimination would ultimately result in lower access fees for consumers. *See, e.g.*, Mackmin Reply at 5 ("[Osborn's] access fees were higher than they would be in a competitive market, because absent the Restraints, Defendant banks, ATM operators, and networks would be competing for the transaction, both through providing access to alternative networks, and lowering their fees to compete with other ATM operators, networks, and each other."); Stoumbos Reply at 10 ("The

---

7       The Mackmin proposed amended complaint states that plaintiff Andrew Mackmin has a Visa-branded card "with no bugs on the back" and plaintiff Sam Osborn has a MasterCard-branded card which "shows no other network 'bugs' on the card." Mackmin Proposed Compl. ¶¶ 15, 17. Plaintiff Barbara Inglis has a multiple-bug card and "has incurred access fees in connection with cash withdrawals from Defendant Banks." *Id.* ¶ 16.

The Stoumbos proposed amended complaint alleges that plaintiff Mary Stoumbos has a PIN card that bears the Visa, MasterCard, CU Services Centers, Co-Op Network, and Star network bugs and that she used an ATM connected to the Visa, MasterCard, and Star networks. Stoumbos Proposed Compl. ¶ 18. She also alleges that the Star network pays a higher net interchange to ATM operators than either Visa or MasterCard. *Id.*

8       Furthermore, the claim that eliminating the rules would reduce the access fees is highly speculative. It is equally likely that the ATM operators would raise the fees for Visa and MasterCard transactions if freed from the restrictions.

anticompetitive impacts in each market lead directly to higher network costs (lower interchange revenues) to ATM operators and higher ATM Access fees to consumers.").  These assertions are highly conclusory, and they depend on a series of actions by multiple, independent actors who are not before the Court.

While the Court appreciates that these plaintiffs, unlike the ATM operators, are consumers, and that the purpose of section 4 the Clayton Act was to create a remedy for consumers "who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets," *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983), consumer plaintiffs must nonetheless have standing to sue.  The complaints still founder on the injury in fact and redressability elements, and plaintiffs do not have standing.  Even if the Court is incorrect about that matter, and the consumer plaintiffs have alleged a sufficiently actual and imminent injury to confer standing, they have not yet cured the other deficiency that led to the dismissal of the complaints:  the lack of a conspiracy.

## II.   THE PROPOSED AMENDED COMPLAINTS DO NOT ALLEGE AN AGREEMENT

A violation of Section 1 of the Sherman Antitrust Act requires a showing of an agreement and a restraint of trade.  15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal.").  The Court ruled that the first amended complaints failed to plead sufficient facts to allege the existence of an agreement.  They failed to allege that the member banks of Visa or MasterCard agreed among themselves to do anything.  Allegations that the member banks made a prior agreement when they were members of the bankcard associations do not suffice to allege a current agreement.  *Nat'l ATM Council*, 922 F. Supp. 2d at 92.  Further, they did not allege facts

that the banks could or did exercise any control over Visa or MasterCard making the networks a vehicle through which they could carry out the alleged conspiracy. *Id.* at 93.  And, plaintiffs did not allege facts to allow the Court to infer an unlawful agreement, such as facts showing that the actions of the participants represented a radical shift from the industry's prior business practices or that they were against the participants' own interests. *Id.* at 94–95.  The proposed complaints seek to remedy these issues by providing additional factual allegations.

Plaintiffs reassert many of the same facts as originally pled.[9]  They allege that Visa's and MasterCard's member banks are participants in an agreement because they know that they are all bound by the access fee rules that existed prior to the IPOs.  NAC Proposed Compl. ¶ 103; Mackmin Proposed Compl. ¶ 119; Stoumbos Proposed Compl. ¶ 41.  But as the Court previously held, "membership in an association – much less membership in a defunct association – is not enough to establish agreement or conspiracy." *Nat'l ATM Council*, 922 F. Supp. 2d at 93.  Thus, plaintiffs provide no additional facts that constitute direct evidence of agreements that would support a claim of a current horizontal conspiracy among the member banks.[10]

---

9       They reassert that Visa and MasterCard were formerly bankcard associations owned and operated by their competing member banks.  NAC Proposed Compl. ¶ 89; Mackmin Proposed Compl. ¶ 108; Stoumbos Proposed Compl. ¶¶ 28–29.  Member banks elected the associations' Board of Directors, and these Boards created rules and operating regulations, including the ATM Restraints.  NAC Proposed Compl. ¶ 90; Mackmin Proposed Compl. ¶ 109; Stoumbos Proposed Compl. ¶ 29.  In 2006 and 2008 respectively, MasterCard and Visa each completed IPOs and became independent corporations.  NAC Proposed Compl. ¶ 89; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶ 38–39.  The member banks "retain a significant financial and equity interest" in the resulting entities.  NAC Proposed Compl. ¶¶ 99–100; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶¶ 38–39.

10      Also, the new complaints acknowledge that, after the IPOs, member banks do not control Visa and MasterCard, so there is no basis to conclude the corporations are simply a shell through which the banks continue a horizontal agreement.  NAC Proposed Compl. ¶¶ 99–100; Mackmin Proposed Compl. ¶¶ 116–17; Stoumbos Proposed Compl. ¶¶ 38–39.

As for facts that would allow the Court to infer the existence an unlawful agreement, the proposed consumer complaints allege that the access fee rules are not in the individual interests of the member banks, and that they would only make sense if all member banks agreed to them. Mackmin alleges that the rules are contrary to any one bank's self-interest because "[a] bank that was not bound by the Restraints could charge lower prices for transactions conducted over networks that pay a higher net interchange fee, and attract customers away from banks that complied with the Restraints."  Mackmin Proposed Compl. ¶ 98.  Stoumbos alleges that the rules are against the interests of ATM operators, who would rather maximize revenues by retaining the flexibility to set discounted access fees for transactions that can be routed to other networks that pay higher net interchange.  Stoumbos Proposed Compl. ¶ 53.  But Stoumbos does not explain how this applies to banks.  The NAC plaintiffs do not expressly state that the rules conflict with an individual bank's interest, but they do allege that the rules aid the banks if all banks agree to them because the rules "shield[] banks (as issuers of cards) from facing interbrand competition (from other banks using more efficient ATM networks) on the basis of the kind of debit card each bank" issues and that it is "in their interests as banks to abide by the ATM Restraints to avoid competitive ATM access fees."  NAC Proposed Compl. ¶¶ 103, 105.

Assuming the truth of these allegations, the question for the Court is whether they are sufficient for the Court to infer an unlawful agreement.  The Court concludes they are not, because other alleged facts indicate that banks have reasons to join or stay in the Visa and MasterCard networks based on their individual interests.  The fact that Visa and MasterCard process the majority of ATM transactions, NAC Proposed Compl. ¶ 39, Mackmin Proposed Compl. ¶ 57, Stoumbos Proposed Compl. ¶ 63, suggests it is in each bank's individual interests to join these networks.  The Mackmin plaintiffs further allege that Visa and MasterCard offer

member banks favorable network fees to enter into exclusive deals to market their cards only. Mackmin Proposed Compl. ¶¶ 83–87.   These facts support a conclusion that entering into agreements with these networks is in the banks' individual interests, which weighs against an inference of an agreement.

In the absence of any other allegations that support a finding of an agreement, the conspiracy claims lack the one thing they need:  a conspiracy.

## CONCLUSION

For the reasons set forth above, the Court will deny plaintiffs' motions for leave to file amended complaints with prejudice and deny as moot their motions to amend the judgment.

AMY BERMAN JACKSON
United States District Judge

DATE:  December 19, 2013