UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC. *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> VISA INC. *et al.*, ) <br> ) <br> Defendants ) | Civil Case No. 11-1803 (RJL) |
| LYNNE BARTRON, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> VISA INC. *et al.*, ) <br> ) <br> Defendants ) | Civil Case No. 11-1831 (RJL) |
| PETER BURKE, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> VISA INC. *et al.*, ) <br> ) <br> Defendants ) | Civil Case No. 11-1882 (RJL) |

**MEMORANDUM OPINION**

(August 4, 2021) [Dkts. ## 114, 152, 177]

Automatic teller machines ("ATMs") allow individuals, all around the country, to conveniently withdraw cash from their bank accounts without having to locate an open

1

bank branch to consummate their transaction. Although customers will often use ATMs that are owned and operated by their own banks, they will sometimes pay an "access fee" to use an ATM that is not affiliated with their bank, conducting what is referred to as a "foreign" ATM transaction. Whenever a foreign ATM transaction occurs, the ATM terminal must communicate with the customer's bank through an ATM network. The plaintiffs in this putative class action are two groups of consumer ATM users and one group of independent, non-bank-affiliated ATM operators. Defendants Visa and MasterCard operate several of the ATM networks that plaintiffs utilize during foreign ATM transactions. Plaintiffs allege that Visa and MasterCard have imposed contractual provisions—the "ATM Access Fee Rules" or "the Rules"—that prevent ATM operators from charging a discounted access fee if a customer's transaction can be processed over an alternative network that is less expensive than Visa or MasterCard networks, and they allege that those rules unreasonably restrain trade and therefore violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

Currently pending before the Court are the plaintiffs' motions for class certification [Dkts. ## 114, 152, 177]. Upon consideration of the pleadings, the record, and the relevant law, I find that class certification is appropriate as to all three proposed classes and therefore GRANT plaintiffs' Motions for Class Certification.

**FACTUAL AND PROCEDURAL BACKGROUND**

When an individual uses an independent ATM (or an ATM operated by a bank other

than his own), the transaction is referred to as a "foreign transaction."[1] Defs.' Mem. in Opp'n. to Renewed App. for Prelim. Inj. at 4 [Dkt. # 99]. For the purposes of this case, there are four relevant actors in a foreign transaction: (1) the individual accountholder who initiates a transaction by inserting his or her bank-issued ATM card into an ATM; (2) the bank that issued the accountholder's ATM card and maintains his or her accounts; (3) the ATM operator; and (4) the ATM network that connects the "foreign" ATM to the bank. *Id.* at 4–5.

Visa and MasterCard operate the "Plus" and "MasterCard" ATM networks respectively, but there are a number of networks that also facilitate foreign ATM transactions. Decl. of Jeff Sachs, ¶ 7 [*Nat'l ATM Council* Dkt. # 99-1]; Decl. of Leland Englebardt, ¶¶ 4, 7 [*Nat'l ATM Council* Dkt. # 99-2]. In any given transaction, the specific network that is utilized is a function of the networks that the ATM can access, the networks with which the customer's bank-issued ATM card will work, and the preferences that are established by the card-issuing bank. At a minimum, the ATM card and the ATM must share at least one common network for the transaction to work. *See* Defs.' Consolidated Opp. at 7.

As a contractual condition for accessing their networks, Visa and MasterCard impose non-discrimination provisions referred to as the "ATM Access Fee Rules." The

---

[1] As mentioned above, many banks own and operate their own ATMs. When an individual uses an ATM that is owned and operated by their own bank, the transaction is referred to within the banking industry as an "on-us" transaction. Decl. of Jeff Sachs, ¶ 8 [Dkt. # 99-1]. The only parties involved in the transaction are the individual customer and the bank. The transaction does not require an ATM network, and the bank does not normally charge the customer an access fee for using an ATM. Defs.' Mem. in Opp. to Renewed App. for Prelim. Inj. at 4 [Dkt. # 99-1]. Those transactions are not at issue in this case.

ATM Access Fee Rules were adopted in 1996 but have remained substantially the same since that time. *Id.* at 14-17. Stated simply, the rules prohibit ATM operators from charging access fees for transactions processed over Visa or MasterCard networks that are higher than any access fee they charge for transactions processed over alternative networks. Powell Decl. ¶ 2; Sachs Decl. ¶ 16; Englebardt Decl. ¶ 21.

All three plaintiff groups filed these civil class action lawsuits in October 2011. These three groups of plaintiffs each seek class certification in these related cases. First is the National ATM Council, an association of independent ATM operators suing on behalf of its members, and thirteen independent ATM owners and operators ("ATM Operator" plaintiffs). Second Am. Compl., ¶¶ 10–25 [*Nat'l ATM Council* Dkt. # 55]. Second are individuals and entities that paid unreimbursed access fees directly to any defendant or "Bank Co-Conspirator" for a foreign ATM transaction using an ATM card issued by a U.S. financial institution ("*Mackmin* Consumer" plaintiffs). *Mackmin* Mot. for Class Cert. at 2 [*Mackmin* Dkt. # 180]. Third are persons who were charged an access fee for a domestic cash withdrawal transaction at an independent ATM who were not fully reimbursed by their bank. ("*Burke* Consumer" plaintiffs). *Burke* Mot. for Class Cert. at 1 [*Burke* Dkt. 114].

## STANDARD OF REVIEW

In determining the propriety of a class action, the central question is whether the requirements of Federal Rule of Civil Procedure 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rule 23 requires a two-step analysis to determine whether class certification is appropriate. First, plaintiffs

4

must satisfy all four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a). "Failure to adequately demonstrate any of the four is fatal to class certification." *Moore v. Napolitano*, 269 F.R.D. 21, 27 (D.D.C. 2010). Next, the class must fall within one of the three categories of Rule 23(b). In order to satisfy Rule 23(b), plaintiffs must demonstrate either: (1) that the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent adjudications; (2) that the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods of adjudication of the controversy ("predominance" and "superiority"). Fed. R. Civ. P. 23(b). There is no formula or bright-line test for determining whether common issues predominate over individual issues. Rather, predominance ultimately depends on the degree to which resolution of the common issues might advance the overall litigation. *See Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017). Courts have broad discretion in determining whether to permit a case to proceed as a class action. *See Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994).

## ANALYSIS

### I.     Rule 23(a) Requirements

The numerosity, commonality, and typicality requirements of Rule 23(a) are so clearly met in this case that the defendants raise no opposition to these requirements being satisfied. In that regard, plaintiffs point out that: (1) each proposed class is comprised of thousands, if not millions, of potential plaintiffs; (2) common questions include, but are not limited to, whether the Rules constitute a contract, combination, or conspiracy to restrain competition; whether the Rules unreasonably restrain trade; whether the Rules inflate access fees; and whether plaintiffs are entitled to injunctive relief; and (3) all three plaintiff groups are pursuing the same antitrust claims based on the same legal theories and seek redress for the overcharges allegedly caused by the same challenged course of conduct.

Next, I must consider whether the lead plaintiffs in these three proposed classes can adequately represent the interests of the proposed classes. Defendants do not contest the adequacy of the plaintiffs in the *Mackmin* Consumer class or the ATM Operator class, and I agree with plaintiffs that no conflicts of interest are apparent; that the representatives are identically situated to the class members; that the class representatives are able to vigorously prosecute the interests of the classes; and that counsel are well-qualified. Defendants argue, however, that the *Burke* Consumer plaintiffs have failed to identify adequate class representatives. Defs' Opp. at 82-83. Defendants argue that the Burke class representatives' own testimony shows that they are unfamiliar with even the basic contours of the case, and that they are not willing to take an "active role." *Id.* at 82.

Defendants base this argument on testimony by *Burke* Consumer class representatives indicating that the representatives were not aware of any of the Court's decisions in this lawsuit, and that they had not reviewed any of the Court's written rulings. *Id.*; Ex. 34, Heiskell Dep. At 35:6-8; Ex. 114, Byrnes Dep. At 136:6-10; Ex. 149, Harrison Dep. At 26:1-7; Ex. 35, Burke Dep. At 179:6-19. They claim that the representatives were unfamiliar with the documents filed in the action (one representative appeared at testimony unfamiliar even with the Complaint itself), and that the representatives were unable to demonstrate a basic understanding of the issues central to the case. Defs' Opp. at 83.

However, the representatives' knowledge of the case is not so shockingly minimal as to fall into the small group of cases where class representatives are rejected on this basis. *See, e.g., In re Barclays Bank PLC Securities* Litigation, 2016 WL 3235290, *7 (S.D. N.Y. 2016) ("Given the complex nature of the case, [plaintiff] is not required to have expert knowledge of all the details of the case … and a great deal of reliance on expert counsel is to be expected") (citation omitted); *Brooks v. Darling Int'l, Inc.*, 2017 WL 1198542, *12 (E.D. Cal. 2017) ("Although a demanding knowledge requirement on the part of named plaintiffs is not imposed, '[b]ecause class representatives serve as a guardian of the interests of the class, the representatives must have *some minimal familiarity* with the litigation.'") (citation omitted) (emphasis added); *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 430, 57 Fed. R. Serv. 3d 132 (4th Cir. 2003) ("It is hornbook law … that in a complex lawsuit … the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.").

All but one of the representatives testified that they were familiar with the Complaint, and while there appear to be certain basic factual and legal issues about which the class representatives lack clarity, this is a complicated antitrust matter and the representatives demonstrated the basic level of factual and legal understanding necessary to serve as adequate representatives of their class.

For all of the foregoing reasons, I find that all three plaintiff groups have adequately demonstrated that their proposed classes satisfy the requirements of Rule 23(a). To prevail on their request for class certification, then, each group must demonstrate that they satisfy the requirements of at least one of the Rule 23(b) categories.

### II. Rule 23(b) Requirements

#### a. Rule 23(b)(2)

The *Mackmin* and *Burke* Consumer plaintiffs argue that defendants have "acted or refused to act on grounds generally applicable to the class," thus satisfying the requirements of Rule 23(b)(2). Fed. R. Civ. P. 23(b)(2). Consumer plaintiffs argue that the challenged Rules are still in force today, and they therefore seek not only monetary damages but also declaratory and injunctive relief that eliminates the Rules and prevents their further enforcement. *See Mackmin* SAC ¶ 212(b)-(d) [*Mackmin* Dkt. # 84]. I agree with consumer plaintiffs that these equitable claims warrant class treatment under Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendants do not dispute (1) that the challenged Rules govern each and every class transaction, or (2) that consumer plaintiffs seek uniform, indivisible final injunctive relief enjoining the rules on behalf of the 23(b)(2) class. Defendants raise only that some members of the consumer classes (Visa/Plus and Cirrus-only network holders) might face higher access fees should an injunction be granted. Defs.' Opp. at 80. Therefore, defendants argue, some class members would be subjected to higher charges if the relief plaintiffs seek is awarded. *Id.* Defendants claim that this possibility that some members of the proposed classes would be met with higher charges defeats the cohesiveness necessary for certification pursuant to Rule 23(b)(2). *Id.*

Unfortunately for defendants, this hypothetical possibility is insufficient to beat certification under Rule 23(b)(2). First, and most importantly, it is uncontested that plaintiffs challenge the ATM Access Fee Rules, the injunction of which would be generally applicable to the entire class. *See Burke* Mot. for Class Cert. at 31. Should plaintiffs ultimately prevail on the merits of their case, it is uncontested that the injunctive relief sought would be appropriate respecting the class as a whole. Plaintiffs' experts opine that competition in the but-for world would result in lower surcharges for all class members. *See Burke* Mot. for Class Cert. at 7-8; *see generally* Lehr Rep. And even if defendants' speculations are correct, and the injunctive relief sought led to higher surcharges for certain cardholders, consumers in the but-for world would have the opportunity to obtain alternative cards, especially given the number of non-exclusive and multi-network ATM cards that are currently available. Class members who have only exclusive Visa/Plus and Cirrus-only cards will be eligible for damages for past

overcharges and will have expanded options to avoid future overcharges pursuant to the injunctive class.

Moreover, it is well-established that not all potential class members must be aggrieved by, or desire to challenge, a defendant's conduct to render the application of Rule 23(b)(2) appropriate. *See, e.g., Woodward v. Rogers*, 344 F.Supp. 974, 979 n.9 (D.D.C. 1972). For the class to be certified in an action seeking injunctive relief, it is sufficient if the class members complain of a pattern or practice that is generally applicable to the class as a whole, even if some class members have not been injured by the challenged practice. *See Davis v. Astrue*, 250 F.R.D. 476 (N.D. Cal. 2008).

For all of the foregoing reasons, I find that the *Burke* and *Mackmin* Consumer plaintiff groups have adequately demonstrated that their proposed classes satisfy the requirements of Rule 23(b)(2).

### b. Rule 23(b)(3)

#### 1. Predominance

All three plaintiff groups seek certification pursuant to Rule 23(b)(3), which requires that plaintiffs demonstrate "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods of adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). There is no formula or bright-line test for determining whether common issues predominate over individual issues. Rather, predominance ultimately depends on the degree to which resolution of the common issues might advance the overall litigation. *See Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d

460, 468 (6th Cir. 2017). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). Predominance is "a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 591, 625 (1997); *accord Meijer*, 246 F.R.D. at 307; *Vitamins*, 209 F.R.D. at 262-63.

Defendants do not contest that the claims of all three plaintiff groups focus on the same operative set of facts and legal theories. Proposed class members of all three groups were allegedly harmed by the defendants' conduct which includes, *inter alia*, the adoption of the ATM Access Fee Rules that plaintiffs argue hindered any competitive pressure to reduce those fees and otherwise restrained competition. *See generally* Compls. Moreover, all three plaintiff groups have demonstrated that common evidence will predominate in proving each element of their claims. As to plaintiffs' claims under Section 1 of the Sherman Act, the central question of whether the Rules amount to an unreasonable restraint on trade is a common question to all class members. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Common questions will include not only determining the appropriate standard under which to assess the lawfulness of the Rules, but will also guide the analysis under either a *per se* or rule of reason standard. Moreover, plaintiffs have put forward evidence, including in the form of expert opinions, that the ATM Access Fee Rules

are not related to lawful business purpose or network function, but instead serve only conspiratorial anticompetitive functions. *See* Zona Rep. at ¶¶ 33, 42, 50; McAndrews Rep. at ¶¶ 12-22.

The real contested issue of predominance in these cases, then, turns on whether there is sufficient common evidence of resulting injuries and the amount of those injuries. Upon careful review of the parties' submissions, including their expert reports, I find that there is. First of all, plaintiffs need not prove at this stage that these "questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (plaintiffs must "show[] that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class") (emphasis in original)); *accord Rail Freight V*, 934 F.3d at 622-23; *Coleman*, 306 F.R.D. at 85. Class certification is inappropriate where a proposed methodology for calculation of individual damages is clearly inadequate. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311–312 (3d Cir. 2008).

In their consolidated opposition, defendants attack primarily whether plaintiffs' methods will in fact prove injury and damages for each class-member on the merits. *See* Defs.' Opp. at 31-37. However, plaintiffs, at this stage in the proceedings, need only demonstrate a colorable method by which they intend to prove class-wide impact. *In re Vitamins Antitrust Litigation*, 209 F.R.D. 251, 264 (D.D.C. 2002). Although defendants argue that plaintiffs' approaches to proving that impact are hopelessly flawed, plaintiffs have offered means of proving the anti-competitive impact of defendants' conduct that are reasonable and well established in the following respects:

*Burke* Consumer plaintiffs' expert, Dr. Lehr, points to significant academic

12

literature that in competitive markets, industry-wide taxes are fully incorporated into industry-wide prices. Lehr Rep. at § 7.7. Although defendants quibble with this point, the fact that plaintiffs can point to significant scholarship and precedent in support of their claims is sufficient at this stage—this is not an adjudication of the merits of plaintiffs' claims. *See In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365 (D.D.C. 2007). Further, as to damages, Dr. Lehr's industry-wide tax model focuses on the first level price charged by the firm whose costs are increased by the tax (here, the ATMs) and on the amount of that tax that is passed on in that firm's first level price to its immediate, direct customer (the class member), using data sets including Visa's own data to calculate industry-wide overcharges. This overcharge damages model provides for class-wide resolution of damages using well-accepted methodology for establishing injury and damages. *See VisaCheck/Master Money I*, 192 F.R.D. at 81-87.

*Mackmin* Consumer plaintiffs similarly note that defendants' own documents support the relationship between net interchange and surcharges. They further rely on their expert, Professor Carlton, who opines that the ATM Access Fee Rules had a class-wide impact, causing all or virtually all class members to pay higher surcharges than in a "but-for world." *See* Carlton Rep. ¶ 83. This opinion is based on economic theory and empirical studies, defendants' own documents, market structure analysis, and empirical analysis of transactional data. Defendants take issues with Prof. Carlton's use of Wells Fargo's increased ATM surcharges as representative of the ATM industry as a whole, but again, this critique is better suited for adjudication of plaintiffs' injury and damages on the merits, not at the class certification stage. *See* Defs' Opp. at 30. Further, as to damages, Professor

Carlton's model computes a per-transaction overcharge, which provides a colorable and well-accepted methodology for class-wide resolution. *See VisaCheck/Master Money I*, 192 F.R.D. at 81-87.

Finally, ATM Operator plaintiffs demonstrate that individualized inquiries would not be necessary to ascertain the fees paid by each class member. Plaintiffs argue that putative class members were overcharged precisely the same per-transaction amount at any given time for every authorized, surcharge-bearing ATM cash withdrawal settled and cleared over the defendants' networks, and that aggregate, class-wide damages are directly calculable from the total number of transactions processed by each of defendants' networks using a reliable estimate of the extent of the anticompetitive overcharge. *See* Nat'l ATM Operators Mot. for Class Cert. at 50-51. Again, while defendants contest the merits of plaintiffs' injury and damages models, plaintiffs have met their burden here of demonstrating a colorable method by which they intend to prove class-wide impact.

Defendants also assert that plaintiffs' class certification is barred because as a matter of law, plaintiffs must conduct two-sided market analyses under *Amex*. However, plaintiffs are correct that defendants' specific arguments should not be dispositive at the class certification stage. *Amex* applies in "rule of reason" cases, while plaintiffs here contend that the Access Fee Rules are subject to *per se* treatment. Additionally, the market here is not a mirror image to the three-participant market in *Amex*. In the final analysis, plaintiffs need not show at this time that the common questions raised will be answered, on the merits, in favor of the class.

### 2. Superiority

Rule 23(b)(3) precludes certification unless the court finds, in addition to a predominance of common questions, "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed R. Civ. P. 23(b)(3). The Rule identifies four factors as pertinent to that inquiry: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced; (c) the desirability of concentrating the litigation in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action. *Id.*

The first factor supports certification where "recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis[.]" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Such would be the case here, where especially for consumer plaintiffs, the cost of litigation would almost certainly dwarf any individual damages award. A "core" purpose of class actions is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action." *Amchem Prods.*, 521 U.S. at 617. A class action is thus superior where, as here, "the class action device would 'enable vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all.'" 2 NEWBERG ON CLASS ACTIONS § 4.65 (5th ed. 2019) (quoting *Amchem*, 521 U.S. at 617). Similarly, ATM Operator plaintiffs will gain "significant economies of time and expense" by class litigation given the dearth of individualized issues of either liability or damages. *Nat'l ATM Council* Mot. for Class Cert. at 54.

15

The remaining factors likewise favor a class action as the superior method of resolving the claims in these related actions. Concentrating these claims, and these three cases, in a single forum promotes judicial efficiency and uniformity of decisions as to persons similarly situated, *Vitamins*, 209 F.R.D. at 270, and this Court is not aware of any related litigation by or against members of the proposed classes. Finally, no inherent difficulties undermine the maintenance of these cases as class actions—quite the opposite! In complicated antitrust cases such as these with tens of thousands of potential class members and so few individualized issues, requiring individual litigation of each class member's claims "would merely multiply the number of trials with the same issues and evidence." *High-Tech Empl.*, 985 F. Supp. 2d at 1228. As such, Rule 23(b)(3) is easily satisfied here.

## CONCLUSION

For all of the foregoing reasons, plaintiff groups have met their burden under Rule 23 and as such their Motions for Class Certification [Dkts. 114, 152, 177] are GRANTED. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON  
United States District Judge