**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., *et al.*,<br><br>Defendants. | ) | Civil Case No. 11-1803 (RJL) |

**MEMORANDUM OPINION**

September 30th, 2026 [Dkt. #269, 272]

When using an automated teller machine ("ATM") to withdraw cash, most people pay a fee if the ATM does not belong to their bank. The operator of the ATM machine sets that fee, which is called a "surcharge" or "ATM Access Fee." Every ATM card is linked to an ATM network, such as Visa's Plus network, that facilitates the transaction. The cost for using an ATM network to withdraw cash varies based on the network. But the ATM Access Fee Rules at the center of this case stop ATM operators from charging consumers different ATM Access Fees for transactions over different ATM networks. "Thus, under the [ATM] Access Fee Rules, operators cannot say to cardholders: 'We will charge you $2.00 for a MasterCard or Visa transaction, but if your card has a Star or Credit Union 24 bug on it, we will charge you only $1.75.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1061 (D.C. Cir. 2015).

In this long-running class action, the plaintiffs—independent ATM operators—allege that defendants Visa's and Mastercard's ATM Access Fee rules violate antitrust law. Plaintiffs' claimed injury, however, is not the inability to charge consumers different Access Fees for different ATM networks. Rather, plaintiffs claim a monetary injury from the high network fees charged by defendants to plaintiffs.[1] Network fees are one of many internal fees on the *backend* of ATM transactions. To connect defendants' ATM Access Fee Rules with their injury from high network fees, plaintiffs argue that if they could have charged consumers different fees for different ATM networks, consumers would then have demanded ATM cards with multiple (cheaper) networks from their banks, the banks would have provided these cards, sufficient volumes of transactions would have shifted to cheaper ATM networks, and defendants would have lowered their network fees as a result. *See Osborn*, 797 F.3d at 1063 (describing the chain of causation). Our Circuit Court held that plaintiffs' allegations of causation sufficed to show Article III standing at the motion to dismiss stage. *See id.* at 1065. But our Circuit cautioned that plaintiffs would need to prove their economic assumptions at trial. *See id.* Now, after a lengthy period of discovery, plaintiffs have failed to produce evidence of causation that a reasonable jury could rely upon to find Article III standing. For this reason, I **GRANT** defendants' motion for summary judgment and **DISMISS** the case for lack of subject-matter jurisdiction.

---

[1] The parties dispute whether plaintiffs directly pay the network fees to defendants, but that dispute is not relevant for purposes of this opinion. *See* Visa & Mastercard Defs.' Mem. of Law in Supp. of Mot. for Summ. J. [Dkt. #271-1] at 34–38; Statement of P. & A. in Opp'n to Defs.' Mot. for Summ. J. [Dkt. #281-1] at 24–33.

## BACKGROUND

### I. Facts

#### A. Overview of a Foreign ATM Transaction

When making an ATM transaction, consumers can use ATMs operated by the bank that issued the ATM card ("the issuing bank"), or they can go to a "foreign" ATM, which is an ATM operated by a third party besides the issuing bank. *See* Visa & Mastercard Defs.' Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("DSMF") [Dkt. #271-2] ¶ 1.[2] This case is about foreign ATM transactions.

Plaintiffs represent a class of independent, non-bank ATM operators that operate foreign ATMs. DSMF ¶ 4. Plaintiffs work with "sponsoring" or "acquiring" banks to access ATM networks. *Id.* ¶ 12. Some independent ATM operators are sponsored by independent sales organizations ("ISOs"). *Id.* ¶ 13. Some ISOs are independent ATM operators themselves. *Id.* ¶ 15.

Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. (collectively "Visa") and Mastercard Inc. and Mastercard International Inc. (collectively "Mastercard") are ATM networks that facilitate ATM transactions over the Plus (Visa) and Cirrus (Mastercard) networks. *Id.* ¶¶ 5–7. Besides defendants Visa and Mastercard, there are other ATM networks like Star, NYCE, Pulse, Shazam, Accel, and Credit Union 24. *Id.* ¶¶ 8–9.

When a consumer visits a foreign ATM, the process follows several steps: *First*, the

[2] All facts are undisputed unless otherwise noted.

consumer inserts their card into the ATM. DSMF ¶ 20(a). *Second*, the ATM chooses an ATM network to execute the transaction. *Id.* ¶ 20(b). The ATM chooses the ATM network based on several factors, including the networks enabled on the card, the networks the ATM accepts, and a variety of routing rules. *Id.* *Third*, the ATM submits the transaction request to the acquiring bank. *Id.* ¶ 20(c). Acquiring banks or sponsoring banks are different from the cardholder's issuing bank and provide the ATM with access to the ATM networks. *Id.* ¶ 11. The acquiring bank routes the transaction request through the ATM network to the issuing bank. *Id.* ¶ 20(c). *Fourth*, the issuing bank denies or approves the transaction. *Id.* ¶ 20(d). *Fifth*, if approved, the approval is transmitted back through the ATM network to the acquiring bank, and the ATM dispenses cash to the consumer. *Id.* ¶ 20(e). *Sixth*, the ATM network handles clearing and settlement of the amounts owed for the transaction. *Id.* ¶ 20(f).

During an ATM transaction, several fees change hands.

**Interchange Fee:** The issuing bank pays the interchange fee. *Id.* ¶ 22. The parties dispute whether the interchange fee goes to the acquiring bank or whether it goes directly to the ATM operator. *See id.*; Pls.' Resp. to Defs.' Rule 7(h) Statement ("Pls.' Resp. to DSMF") [Dkt. #281-2] ¶ 22. The ATM networks, including defendants, set interchange fees but do not retain any part of it. DSMF ¶ 24.

**Switch Fee:** The issuing bank pays the switch fee to the ATM network. *Id.* ¶ 25. The ATM networks set their own switch fees. *Id.*

**Network or Acquirer Fee:** The acquiring bank (or the ATM operator, the parties dispute this) pay this fee to the ATM network. *Id.* ¶ 25; Pls.' Resp. to DSMF ¶ 25. The

ATM networks set their own network fees. DSMF ¶ 25. Plaintiffs argue that defendants have set their network fees above competitive levels ("supracompetitive fees"), forcing plaintiffs to pay unfairly high fees to defendants. *See* Statement of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") [Dkt. #267-3] at 14–15.

**Net Interchange:** "Net interchange" refers to the amount that the acquiring bank (or the ATM operator, the parties dispute this) keeps after deducting the network fee (paid to the ATM networks) from the interchange fee (paid by the issuing bank). DSMF ¶ 30.

**Surcharge or Access Fee:** Consumers pay the surcharge fee to use a foreign ATM. *Id.* ¶ 44. Plaintiffs argue that defendants have unlawfully restricted surcharge fees. *See* Pls.' Mot. at 16–20.

**B. Defendants' Access Fee Rules**

Defendants Visa and Mastercard initially operated as associations of member banks. *See* Pls.' Rule 56.1 Statement of Undisputed Facts in Supp. of their Mot. for Partial Summ. J. ("PSMF") [Dkt. #267-4] ¶ 4. In 1996, defendants adopted the ATM Access Fee Rules, which restricted surcharge fees charged to consumers at foreign ATMs to "no greater than the amount imposed on all other interchange transactions through other shared networks at the same ATM." *Id.* ¶¶ 27 (Visa), 35 (similar for Mastercard). If ATM operators want to participate in defendants' ATM networks, they must agree to the ATM Access Fee Rules. *Id.* ¶¶ 58, 60. Accordingly, if an ATM operator decides to impose a surcharge, the surcharge (or access fee) ends up being the same for every transaction regardless of the network. *Id.*

¶ 67.[3]

In 2006 and 2008, respectively, Visa and Mastercard both became public corporations through initial public offerings. *Id.* ¶¶ 54, 55. Defendants' ATM Access Fee Rules have remained in effect to the present day, with some minor wording changes. *Id.* ¶¶ 31, 40.

Around 2010, defendants increased their network or acquirer fees significantly. *Id.* ¶ 64. According to defendants' expert, ATM operators could not drop Visa and Mastercard in response to the high network fees because Visa and Mastercard are so widely used. *See* Defs.' Ex. SJDX96, Expert Rep. of J. Douglas Zona, Ph.D. ("Zona Rep.") [Dkt. #271-9] ¶ 36.

## II. Procedural History

This case is one of three long-running antitrust class actions against Visa and Mastercard challenging Visa's and Mastercard's ATM Access Fee Rules. In the other two cases, the plaintiffs are consumers who allege that they paid inflated surcharge fees to use ATMs. *See Mackmin v. Visa Inc.*, No. 11-cv-1831 (D.D.C.); *Burke v. Visa Inc.*, No. 11-cv-1882 (D.D.C.). In 2011, this Court consolidated the three cases given the "common questions of law and fact." *See* Min. Order (Nov. 22, 2011).[4]

My colleague initially dismissed the three consolidated cases for lack of Article III

---

[3] Defendants dispute that the ATM Access Fee Rules require plaintiffs to impose surcharges, but they do not contest that any surcharge imposed must be uniform. *See* Defs.' Counter-Statement in Opp'n to Pls.' Statement of Undisputed Facts ("Defs.' Resp. to PSMF") [Dkt. #282-2] ¶ 67.

[4] A fourth case involves an independent ATM operator who opted out of the class. *See Cardtronics v. Visa Inc.*, No. 25-cv-2747 (D.D.C.).

standing. *See Nat'l ATM Council, Inc. v. Visa Inc.*, 7 F. Supp. 3d 51, 58 (D.D.C. 2013); *see also Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73, 82 (D.D.C. 2013) (holding that plaintiffs failed to allege injury in fact). Our Circuit Court reversed, finding that the plaintiffs had plausibly alleged standing but noting that at summary judgment, plaintiffs would need to substantiate their allegations of standing. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1060, 1065 (D.C. Cir. 2015). On remand, plaintiffs moved for a preliminary injunction on February 23, 2016 stopping defendants from enforcing the ATM Access Fee Rules. Mot. for Prelim. Inj. [Dkt. #60]. I denied the motion for a preliminary injunction for lack of irreparable harm. *See* Mem. Op. [Dkt. #111].

In September 2019, plaintiffs moved for class certification. *See* Mot. to Certify Class [Dkt. #151]. In August 2021, I granted plaintiffs' motion and certified the class. *See* Mem. Op. [Dkt. #192]; Am. Order [Dkt. #197]. Our Circuit Court affirmed my order certifying the class. *See Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013, at *11 (D.C. Cir. July 25, 2023). The class is defined as "[a]ll ATM Operators that originated an Authorized Surcharged ATM Cash Disbursement at a Qualified ATM at any time between October 1, 2007 and the present." Am. Order [Dkt. #197] at 1.

Both *Mackmin* and *Burke*, the consumer class cases, are now proceeding with settlements. *See* Mot. for Authorization to Distribute Visa & Mastercard Settlement Funds, *Mackmin v. Visa Inc.*, No. 11-cv-1831 (D.D.C. filed Nov. 18, 2025); Order Granting Mot. for Prelim. Approval of Settlement, *Burke v. Visa Inc.*, No. 11-cv-1882 (D.D.C. filed Aug. 14, 2026).

In this case, following a lengthy period of discovery, on February 18, 2026, plaintiffs

moved for partial summary judgment. Statement of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") [Dkt. #267-3]. Defendants opposed, *see* Visa & Mastercard Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Partial Summ. J. ("Defs.' Opp'n") [Dkt. #282-1], and cross-moved for summary judgment, *see* Visa & Mastercard Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mot.") [Dkt. #271-1]. Plaintiffs oppose defendants' motion. *See* Statement of P. & A. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") [Dkt. #281-1]. The parties have each filed reply briefs in support of their respective cross-motions. *See* Reply Statement of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Reply") [Dkt. #286-1]; Visa & Mastercard Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") [Dkt. #287-1].

In addition to the summary judgment motions, plaintiffs have moved to exclude defendants' expert R. Garrison Harvey, and defendants have moved to exclude plaintiffs' expert Dr. J. Douglas Zona. *See* Pls.' Mot. to Exclude Expert Testimony from R. Garrison Harvey [Dkt. #268-2]; Defs.' Mot. to Exclude Certain Opinions of Dr. J. Douglas Zona [Dkt. #270]. All motions are now ripe.

## LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute of material fact exists when there is sufficient "evidence on which the jury could reasonably find for the [non-movants]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

252 (1986). The Court must view the record in the light most favorable to the non-moving party. *See id.* at 255. "When parties file cross-motions for summary judgment, each motion is considered separately, in the light most favorable to the non-moving party, and the court must determine, for each motion, whether the Rule 56 standard has been met." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 80 (D.D.C. 2025).

## ANALYSIS

The parties have moved for summary judgment on numerous issues.[5] Because defendants have cross-moved for summary judgment as to plaintiffs' Article III standing, which addresses the Court's subject-matter jurisdiction, I address defendants' Article III standing argument first. At this stage of the litigation, I conclude that plaintiffs have failed to satisfy the causation and redressability requirements for Article III standing, and therefore I lack subject-matter jurisdiction over the remaining issues. In the alternative, plaintiffs lack antitrust standing.

### I. Article III Standing

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by the Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "[A] showing of standing 'is an essential and unchanging' predicate to any exercise of our

[5] Plaintiffs have moved for partial summary judgment as to only defendants' liability for their first Sherman Act claim alleging a horizontal restraint on trade. *See generally* Pls.' Mot.; Second Am. Compl. [Dkt. #55] ¶¶ 119–24. It is unclear whether plaintiffs still intend to pursue their second and third claims alleging vertical restraints on trade. *See* Second Am. Compl. ¶¶ 125–34. On their first claim, plaintiffs seem to suggest that a partial grant of summary judgment in their favor would "leav[e] only the determination of damages for trial." Pls.' Mot. at 1. Defendants argue that plaintiffs still need to prove causation and injury. *See* Defs.' Mot. at 1 n.1.

jurisdiction." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

"Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc.*, 94 F.3d at 663 (internal citations omitted). "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Id.* at 663–64.

Plaintiff bears the burden of demonstrating the Court's subject-matter jurisdiction over the claims at issue. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan*, 504 U.S. at 561). "At summary judgment, [plaintiffs'] burden is to show that a reasonable juror could find [that they have] standing." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012). "To satisfy this burden, [plaintiffs] cannot rest on 'mere allegations' but must establish each element of standing by putting forth 'specific facts.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).

Plaintiffs' claimed injury is the "economic injury" from "supracompetitive increases in Visa's and Mastercard's acquirer-side network fees, which reduced the net interchange paid to Plaintiffs." Pls.' Opp'n at 6–7. In other words, plaintiffs' monetary injury comes

from the high network fees that defendants have charged plaintiffs. Defendants do not dispute that this monetary injury is sufficiently concrete for Article III standing.

But plaintiffs' legal challenge is not to the way that defendants set their network fees. Rather, plaintiffs challenge the ATM Access Fee Rules, which limit the *surcharges* that consumers pay when they withdraw cash from the ATMs. To establish causation, plaintiffs must show that the ATM Access Fee Rules caused plaintiffs' injury from supracompetitive network fees. And to establish redressability, plaintiffs must show that removing the ATM Access Fee Rules would "likely alleviate" plaintiffs' monetary injury. *Fla. Audubon Soc.*, 94 F.3d at 664.

In the initial appeal of the Court's Rule 12(b)(6) dismissal, our Circuit Court held that "[b]ecause the economic facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1066 (D.C. Cir. 2015). Our Circuit Court cautioned, however, that "[o]n a motion for summary judgment by a defendant, the question is not whether the plaintiff has asserted a plausible theory of harm, but rather whether the plaintiff has offered sufficient evidence for a reasonable jury to conclude that its theory is correct." *Id.*

In *Osborn*, plaintiffs described the chain of causation as follows:

> [I]n the absence of the access fee rules, ATM operators would offer consumers differentiated access fees at the point of transaction, consumers would then demand multi-bug PIN cards from their banks, their banks would provide these cards, and the market for network services would become more competitive, all resulting in more choice of networks and lower access fees for consumers.

*Id.* at 1063 (internal quotation marks omitted). Our Circuit described the "factual details" supporting the "alleged causal link between the Access Fee Rules and the [plaintiffs'] economic harm" as follows. *Id.* at 1065.

> According to the Plaintiffs, Visa and MasterCard currently capture over half of all ATM transactions, despite charging higher fees than rival networks. Plaintiffs further allege that independent ATM operators (such as the operator plaintiffs) have the desire and technical capacity to offer discounts on cards linked to low-cost networks. They contend that consumers . . . are 'sensitive to differences in ATM Access Fees and where possible will seek out ATMs with the lowest Access Fees.'

*Id.* (citations omitted).

Our Circuit further noted that plaintiffs "rely on certain economic assumptions about supply and demand: that other consumers besides the Plaintiffs are price conscious; that bank operators will respond to consumer demand for cards tied to low-cost networks; and that in the face of competitive pressure, ATM networks will reduce their network fees." *Id.* "*[T]hese sorts of assumptions are provable at trial.*" *Id.* (emphasis added).

Based on the record, I agree with defendants that plaintiffs have failed to substantiate the "economic assumptions" connecting the ATM Access Fee Rules with the harmful supracompetitive network fees. No reasonable jury could conclude that the ATM Access Fee Rules caused plaintiffs' monetary injury, or that removing the ATM Access Fee Rules would redress plaintiffs' injury. Plaintiffs therefore lack Article III standing.

**A. Non-Party ATM Networks' Rules**

First, plaintiffs' causation theory fails because even if Visa's and Mastercard's ATM Access Fee Rules did not exist, the record shows that other ATM networks' nearly identical rules would have similarly restricted differential surcharges to consumers. "[W]here a

causal relation between injury and challenged action depends upon the decision of an independent third party . . . , 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Lujan*, 504 U.S. at 562).

Here, plaintiffs' injury and estimated damages depends on "a world in which . . . differential surcharging on Visa and Mastercard transactions would have been permitted." Zona Rep. ¶ 82; *see also Osborn*, 797 F.3d at 1063 (describing the first step in the causation chain as "ATM operators [] offer[ing] consumers differentiated access fees at the point of transaction"). But defendants cite evidence that other third-party ATM networks imposed rules that are substantially similar to defendants' ATM Access Fee Rules and, for some networks, predated and postdated the ATM Access Fee Rules. *See* DSMF ¶¶ 53–62.

Since other ATM networks had similar rules in place, "even if Visa and Mastercard had never adopted the challenged rules, ATM operators *still* could not have differentially surcharged Visa or Mastercard transactions under the rules of the *other* ATM networks." Defs.' Mot. at 16. Defendants persuasively argue that ATM operators' inability to use differential surcharging breaks the chain of causation for plaintiffs' theory of harm.

Plaintiffs respond that it "makes no economic or competitive sense" that the other ATM networks would have continued to restrict differential surcharging because it would be against the networks' "economic interests" to "forbid[] non-bank ATM operators from favoring them over more expensive rivals." Pls.' Opp'n at 12–13. Plaintiffs do not explain why, if it was against the third-party ATM networks' "economic interests," at least some of the ATM networks imposed their rules restricting differential surcharging *before*

defendants implemented their rules in 1996. *See* Defs.' Mot. at 16, 18. Plaintiffs' expert simply speculates that other ATM networks *could* have changed their rules if defendants' ATM Access Fee Rules had never existed. *See* Defs.' Ex. SJDX98, Deposition of J. Douglas Zona ("Zona Dep.") (Aug. 5, 2025) [Dkt. #271-9] at 172:7–173:6.

Plaintiffs further speculate that "[n]on-bank ATM operators *could* drop a regional network that insisted on unfavorable terms," Pls.' Opp'n at 13 (emphasis added), but do not cite any evidence that plaintiffs—who are themselves non-bank ATM operators—actually would have dropped the ATM networks that continued to limit differential surcharging, *see also* Defs.' Mot. at 18 (explaining that the regional ATM networks had market power when implementing their rules such that it is speculative to assume that ATM operators would have dropped them).

Plaintiffs' ability to impose differential surcharges is crucial to their theory of injury and causation. *See Osborn*, 797 F.3d at 1063. But plaintiffs have failed to show that they actually could have imposed differential surcharging given other ATM networks' imposition of the same rules, which continue to this day.

**B. Issuing Banks' Behavior**

Second, even if plaintiffs' speculation that they could have dropped other ATM networks or that other ATM networks would have changed their rules is sufficient, plaintiffs' causation theory runs into problems with other third parties—the issuing banks. To connect the ATM Access Fee Rules with plaintiffs' injury from supracompetitive network fees, plaintiffs must show "that other consumers besides the Plaintiffs are price conscious; that *bank operators* [issuing banks] *will respond to consumer demand for cards*

*tied to low-cost networks*; and that in the face of competitive pressure, ATM networks will reduce their network fees." *Osborn*, 797 F.3d at 1065 (emphasis added); *see also id.* at 1063 ("in the absence of the access fee rules . . . *consumers would then demand multi-bug PIN cards from their banks* [and] *their banks would provide these cards*" (emphasis added)).

Yet at summary judgment, plaintiffs have "not pursue[d] or obtain[ed] evidence that any issuing bank would have responded to differential surcharging at ATMs by enabling additional networks on its cards or otherwise altering card configuration." Defs.' Mot. at 19. As defendants explain, "[w]ithout issuing banks affirmatively expanding the set of ATM networks enabled on their cards, differential surcharging at ATMs could not shift transaction volume away from Visa and Mastercard, constrain Visa's or Mastercard's network pricing, or otherwise produce the beneficial competitive effects Plaintiffs allege." *Id.* at 20.

Indeed, far from providing affirmative evidence that issuing banks would have enabled multiple networks on their cards, plaintiffs' expert recognized that issuing banks' relationships with the ATM networks are slow to change. *See* Defs.' Ex. SJDX97, Expert Reply Rep. of J. Douglas Zona, Ph.D. ("Zona Reply Rep.") [Dkt. #271-9] ¶ 35; *see also* Zona Dep. 150:4–12 (acknowledging that even in a world without defendants' ATM Access Fee Rules, the relationships would likely still be resistant to change).

Plaintiffs respond by arguing that "banks commonly offer surcharge-reimbursement programs for foreign ATM withdrawals to attract desirable, high-balance customers." Pls.' Opp'n at 10. That banks have responded to surcharges at foreign ATMs in one way—by

offering reimbursement programs—does not establish that plaintiffs' theory that issuing banks would have enabled multi-network cards is likely, or even correct. *See Dominguez v. UAL Corp.*, 666 F.3d 1359, 1363–65 (D.C. Cir. 2012) (no causation when plaintiff's causal chain was "speculative" and unsupported by the record); *see also Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1174 (S.D. Cal. 2022) ("[A] reasonable juror could not find causation based on the *mere possibility* that BP's Phillips 66's information exchanges could have raised spot-market prices or reduced supply in the absence of any evidence supporting that possibility.").

Similarly, plaintiffs' argument that "issuers' costs of switching ATM networks are minimal," and that "banks *can* participate in more than one network and *can* switch easily between networks," Pls.' Opp'n at 15 (emphasis added), simply establishes that issuing banks could theoretically add more networks. Such a "mere possibility," *Persian Gulf Inc.*, 632 F. Supp. 3d at 1174, falls short of showing that it is "*likely*" that "third parties will . . . react in predictable ways," *California v. Texas*, 593 U.S. 659, 675 (2021) (emphasis added) (quoting *Dep't of Comm. v. New York*, 588 U. S. 752, 768 (2019)). Plaintiffs' generic argument that Visa and Mastercard were sensitive to competitive dynamics in the ATM market, *see* Pls.' Opp'n at 9–10, does not fill in the missing causal links between the ATM Access Fee Rules and the supracompetitive network fees charged to plaintiffs.[6]

[6] Plaintiffs quote Mastercard's expert saying, in response to a question asking whether Mastercard could "offer better economics to ATM operators so that they don't differentially surcharge Mastercard transactions," that "I mean, I don't know. There *could* be all sorts of different strategies available. That *could* be one." Pls.' Ex. OPPEX 3, Dep. of C. Saravia (July 30, 2025) [Dkt. #281-6] at 110:19–111:13 (emphasis added). Plaintiffs cannot satisfy their burden on causation with such open-ended possibilities.

Finally, plaintiffs argue that defendants "misstate[] Plaintiffs' but-for theory" and that the "*prospect* of price-sensitive transaction-volume loss itself would have constrained Visa's and Mastercard's acquirer-side fees." Pls.' Opp'n at 14 (emphasis added). According to plaintiffs, "actual or *threatened* volume loss based on consumers likely selecting lower access fees would have forced Visa and Mastercard to price their acquirer fees competitively to avoid losing volume to cheaper ATM networks." *Id.* at 15 (emphasis added). Plaintiffs' argument—that a "threat" of differential pricing would have constrained defendants' network fees—appears to be an attempt to shift their causation theory to avoid their lack of causation record evidence, and in any case plaintiffs lack record evidence supporting this theory.

This case is similar to *Dominguez v. UAL Corp.*, 666 F.3d 1359 (D.C. Cir. 2012), in which our Circuit held that the antitrust plaintiff lacked Article III standing because "no reasonable juror could find that [plaintiff] was overcharged" for his plane ticket "as a result of the policy" of the airline prohibiting ticket resale. 666 F.3d at 1362–63. In *Dominguez*, the plaintiff's expert's analysis "c[ould] not show that any secondary market would have led to a lower price than what [plaintiff] paid for his flight" because, among other reasons, the analysis "did not take into account costs associated with running a secondary market" and "assume[d] that United would continue to offer the same types of tickets that it does

now." *Id.* at 1363, 1364. The *Dominguez* plaintiff's injury and causation analysis thus "pile[d] speculation atop speculation." *Id.* at 1364.[7]

So too here. Far from substantiating plaintiffs' causation theory with record evidence, plaintiffs seem to rely on the same assumptions that they raised at the motion to dismiss stage. But our Circuit Court was clear that plaintiffs would eventually need to "prove" these assumptions. *Osborn*, 767 F.3d at 1065. Plaintiffs have failed to produce record evidence supporting the causal link between defendants' ATM Access Fee Rules and their injury from supracompetitive network fees. I therefore conclude that plaintiffs lack Article III standing.[8]

## II. Antitrust Standing

In the alternative, plaintiffs lack antitrust standing. An antitrust plaintiff besides the Government "must show actual injury that was 'caused' by the [antitrust] violation." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust

---

[7] Plaintiffs argue that *Dominguez* is irrelevant because in *Dominguez*, "there was nothing to point to in the actual world to indicate that the plaintiff had paid any sort of overcharge," while here "the evidence shows that the Plaintiffs paid tangible and quantifiable price increases." Pls.' Opp'n at 17. Plaintiffs ignore that *Dominguez* addressed both injury-in-fact and causation. *See* 666 F.3d at 1362–63 (concluding that "no reasonable juror could find that Dominguez was overcharged as a result of the policy"); *see also id.* at 1063 (plaintiff's expert could not "show that any secondary market would have led to a lower price").

[8] "[C]ausation and redressability[] are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). For the same reasons that plaintiffs have failed to show causation for Article III standing, they have also failed to establish redressability. Plaintiffs argue that "Article III does not require Plaintiffs to negate every intervening market force or prove with certainty how every third party would behave in the but-for world." Pls.' Opp'n at 5 (citing *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 121–24 (2025)). It is true that plaintiffs need not prove third-parties' behavior "with certainty," but plaintiffs have not even "show[n] a predictable chain of events that would likely result from judicial relief and redress [plaintiffs'] injury," *Diamond Alternative*, 606 U.S. at 121 (internal quotation marks omitted), nor have plaintiffs rebutted defendants' record evidence indicating that plaintiffs' theory of redressability is impossible because other ATM networks impose the same rules.

Principles and Their Application ¶ 335 (2026). "To sufficiently plead causation, a plaintiff must allege that the defendant violated the antitrust laws, that the defendant's alleged violation had a tendency to injure the plaintiff's business or property, and that the plaintiff suffered a decline in its business or property not shown to be attributable to other causes." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001) (cleaned up).

For the same reasons that plaintiffs have failed to show causation for Article III standing, plaintiffs have also failed to establish causation for purposes of antitrust standing. Courts have dismissed antitrust cases for lack of but-for cause. *See, e.g.*, *Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, 2005 WL 3675999, at *3 (D.D.C. Mar. 31, 2005), *aff'd sub nom. Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008); *Louisiana Wholesale Drug Co. v. Biovail Corp.*, 437 F. Supp. 2d 79, 84 (D.D.C. 2006), *aff'd sub nom. Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008). In *Twin Cities*, the plaintiffs alleged that they paid higher prices for a drug because the defendant unlawfully prevented a third party from bringing a cheaper generic version of the drug to the market. *See* 2005 WL 3675999, at *1. My colleague granted summary judgment to the defendant because the plaintiffs failed to show that the third-party company would have received Food & Drug Administration approval and entered the market despite serious quality issues with the generic drug. *Id.* at *5–6. "[P]laintiffs' proof of causation [was] too speculative as a matter of law to present to a jury." *Id.* at *4.

Similarly, my colleague granted summary judgment to the defendant on causation because statements by a different court suggesting that the third party's drug application would have been approved were assumptions that were insufficient to "establish the

requisite causal link for [plaintiff's] claim of injury." *Louisiana Wholesale Drug Co.*, 437 F. Supp. 2d at 84.

In response, plaintiffs rely heavily on the Supreme Court's statement that antitrust plaintiffs "need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969). Rather, "[i]t is enough that the illegality is shown to be a material cause of the injury." *Id.* Plaintiffs' framing of the issue is incorrect. Defendants are not arguing that plaintiffs must eliminate all alternative sources of injury to prove causation—for example, it is apparent that Visa's and Mastercard's significant market share enabled them to raise their network fees. Defendants are arguing that plaintiffs have failed to produce affirmative evidence showing that the ATM Access Fee Rules were, in fact, a "material cause" of the supracompetitive network fees given other ATM networks' rules and the lack of evidence that issuing banks would have behaved differently. Summary judgment is therefore warranted for defendants on the issue of antitrust standing.

## CONCLUSION

"[E]conomic assumptions about supply and demand" may have sufficed to establish Article III standing at the motion to dismiss stage, *Osborn*, 797 F.3d at 1065, but at summary judgment plaintiffs have failed to produce concrete evidence substantiating their causation theory.

For the foregoing reasons, it is hereby **ORDERED** that defendants' Motion for Summary Judgment [Dkt. #272] is **GRANTED IN PART** and the case is **DISMISSED** for lack of subject-matter jurisdiction. An accompanying order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge